EAST COAST AVIATION CORPORATION *vs.* MASSACHUSETTS
PORT AUTHORITY & another
(and a companion case).

Suffolk.   November 8, 1963. — January 14, 1964.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Landlord and Tenant,* Construction of lease, Rent, Lease of airport property.   *Airport.   Equity Pleading and Practice,* Appeal.

Upon appeal from the final decree in a suit in equity in which the evidence was largely documentary and there was no real dispute as to the subsidiary facts found by the trial judge, so that this court was in as good a position as he was to decide the case, this court might draw its own inferences without regard to inferences drawn by him.   [705]

Under a lease, construed in the light of the circumstances and pertinent statutes, from the Commonwealth of land and buildings at an airport providing for a rental, effective from the beginning of the term, consisting of a ground rent, sums designed to amortize the cost to the Commonwealth of construction of the buildings, and interest "upon the unamortized balance" of the construction cost "at a rate equal to the interest rate borne by . . . [bonds to be] issued by the Commonwealth . . . to finance the construction," where the Commonwealth instead financed it out of general funds without issuing bonds and during the term of the lease transferred title to the airport, with "the benefit of all of . . . [the Commonwealth's] rights" in the lease, to a public authority which paid therefor out of the proceeds of its own bonds, the lessee was not relieved of the obligation to pay the interest component of the rental to the Commonwealth and the authority by the nonissuance of bonds of the Commonwealth but must pay such interest at the rate which the Commonwealth would have had to pay had it issued its bonds for the construction, determinable with reasonable accuracy by taking the weighted average rate payable on certain bonds issued by it for other purposes.   [704–709]

BILL IN EQUITY filed in the Superior Court on January 3, 1962.

PETITION filed in that court on June 6, 1962.

The cases were heard by *Ford,* J.

*John J. Grigalus,* Assistant Attorney General, for the Commonwealth.

*Eugene F. Sullivan* for the Massachusetts Port Authority.

*John M. Hall (Mark A. Michelson* with him) for the East Coast Aviation Corporation.

CUTTER, J.   These two cases are (1) a bill for declaratory relief, concerning the so called "bond interest" clauses of an amended lease, brought by East Coast Aviation Corporation (East Coast) against Massachusetts Port Authority and the Commonwealth, and (2) a petition by East Coast, under G. L. c. 258, to recover from the Commonwealth certain tentative payments alleged to have been in excess of East Coast's legal obligation.   The trial judge made findings.

In the first proceeding, a final decree was entered (1) declaring that East Coast "was not obligated to make any payments whatsoever under the bond interest clauses," (2) ordering the authority to repay to East Coast $32,703.13,

and (3) dismissing the bill as against the Commonwealth. In the proceeding under c. 258, a final decree was entered making the same declaration and ordering the Commonwealth to repay to East Coast $11,265.62. The authority appealed from the first decree and the Commonwealth from the second.

The evidence is reported. The facts are stated upon the basis of the judge's findings.

East Coast is engaged in activities relating to aircraft. It is the lessee of land and buildings (now owned by the authority) at Hanscom Field (the airport) in Bedford. Statute 1955, c. 769 (relevant portions of which are set out in the margin[1]), authorized the State Commissioner of Airport Management to build a hangar and shops at the airport.

East Coast entered into a lease (effective November 17, 1955) with the Commonwealth covering land at the airport and also a hangar and two shops to be built there by the Commonwealth, "to be financed by funds to be obtained from the sale of obligations of the Commonwealth." The lease was to run from the date of completion of construction for a period of fifteen years, as to part of the premises, and for twenty-five years as to the remainder. The written lease provided for an annual rental, payable quarterly, "in an amount equal to" the aggregate of (1) payments designed to amortize during the two terms described in the lease the cost of the buildings, which were not to cost in excess of $250,000; (2) "[i]nterest [see art. III (a) (2)]

[1] Section 1 reads, in part, ". . . before any money provided for by this act is expended . . . [the] commissioner shall secure a binding lease for a term of not more than twenty-five years . . . with a responsible commercial aviation company providing, in addition to all other airport charges, annual rental thereunder for the said buildings *sufficient to amortize the cost of said buildings, including the interest* provided for in section two of this act, within the term of such lease" (emphasis supplied). Section 2 provides, "To meet the expenditures . . . in carrying out . . . this act, the state treasurer shall, upon request of the governor and council . . . sell . . . bonds of the commonwealth . . . to an amount . . . not exceeding . . . three hundred thousand dollars . . . [which] shall bear interest . . . at such rate as the state treasurer . . . shall fix," the bonds to be payable between July 1, 1956, and June 30, 1981. Section 3 provides that "funds received . . . from the federal government . . . for projects authorized by this act shall be used to reduce the amount of bonds issued." Statute 1956, c. 490, provides for leases to more than one lessee but otherwise leaves c. 769 unchanged.

for one year upon the unamortized balance of the cost of construction of the buildings . . . at a rate equal to the interest rate borne by the obligations issued by the Commonwealth . . . to finance the construction of the said buildings''; and (3) five cents a square foot for the ground area on which the hangar and shops are situated.

The Commonwealth caused the hangar and shops to be constructed. East Coast, in connection therewith, spent $37,500 of its own, for which the Commonwealth reimbursed East Coast pursuant to the provisions of St. 1958, c. 310, § 1.[2] The lease was amended effective December 1, 1958, so that, inter alia, the following was added, see art. III (a) (4) (ii), as an element of annual rental: "Interest for one year upon the unamortized balance . . . of additional funds expended to complete the construction work . . . amounting to . . . $37,500 . . . . The interest rate shall be equal to the interest rate borne by the obligations issued by the Commonwealth . . . to finance the . . . additional construction work . . . ."

The total cost to the Commonwealth of the construction was $283,694.88, which the Commonwealth paid out of its general funds.[3] The Governor and Council at no time requested the issuance of, nor did the Commonwealth ever

---

[2] Section 1 reads in part, "The state treasurer . . . [may] reimburse East Coast . . . [a lessee] at . . . Hanscom Field, such sums [not exceeding $37,500] as are . . . certified . . . to be . . . monies expended by . . . [East Coast] to complete the construction of projects at said field." Section 2 of c. 310 increased the dollar amount of the bonds to be issued. Section 3 provides that "[b]efore any reimbursement is made . . . [East Coast] shall assent to an amendment . . . whereby its annual rental shall be increased by an amount sufficient to amortize such reimbursement, including the interest [on the bonds] provided for in section two . . . within the term of such lease."

[3] The Commonwealth made this payment at a time when it was investing excess general funds in short term notes at a 1% and 2% per annum return, and in United States Treasury bills at a 2.5% and 2.95% per annum return. The earliest date for a bond issue would have been on or about April, 1958. Bonds not relating to the airport were actually issued by the Commonwealth as follows:

| Date | | Interest Rates | | |
|------|------|------|------|------|
| April, | 1958 | 2.25% | 3% | 2.92% |
| September, | 1958 | 3.5% | 3.455% | |
| April, | 1959 | 3.5% | | |

At the time of the purchase of the airport by the authority, February 17, 1959, the Commonwealth had already paid out of its general funds for the construction of all airport facilities in issue.

issue, any bonds to finance the construction. "[C]onsequently no interest rate was ever established for . . . bonds . . . issued for such purpose."

For a period prior to December 1, 1957, East Coast occupied the premises under an interim arrangement. The contemplated construction at the airport was completed by December 1, 1957, when the term of the lease began to run.

From December 1, 1957, to February 17, 1959, while the Commonwealth was lessor, East Coast made rental payments to it. Because no Commonwealth bonds had been issued, East Coast and representatives of the Commonwealth discussed what payments, if any, were due under the provisions of arts. III (a) (2) and III (a) (4) (ii), already quoted above and hereinafter for convenience, collectively called the "bond interest clause." It was agreed that, pending a determination of the obligations, if any, of East Coast under the bond interest clause, East Coast would make payments, without prejudice to its rights or those of the Commonwealth, at the rate of 3.5% per annum. From December 1, 1957, to February 17, 1959, East Coast, without prejudice, paid the Commonwealth the total sum of $11,265.62 under the bond interest clause.

The authority was created by St. 1956, c. 465 (as amended by St. 1958, c. 599, and subsequently by other statutes not here relevant), as a "public instrumentality." Section 5 provided for the authority's acquisition of title to the airport, "upon the payment to the [State] treasurer on the date of such transfer of" various sums including "a sum equal to the aggregate cash payments under the provisions of" St. 1955, c. 769, "for . . . improvements to the airport properties." Section 5 also provided that the authority should "have the benefit of all of the rights of the commonwealth in . . . all leases . . . relating to the airport properties and existing on the date of the transfer."[4]

---

[4] By § 8, the authority was "empowered to provide . . . for the issuance of [its] revenue bonds . . . for the purpose of providing funds for . . . (b) [m]aking the payments to the [State] treasurer . . . provided for in" § 5. The revenue bonds were not to be obligations of the Commonwealth. See §§ 10 and 11.

Prior to February 17, 1959, the authority obtained funds by issuing its 4.75% revenue bonds. It acquired title to the airport on February 17, 1959, when it made the required payment out of funds so obtained. "Subsequent to February, 1959, East Coast continued, by agreement with the [a]uthority, without prejudice . . . to make payments to the [a]uthority under the bond interest clause" at 3.5% per annum in the total sum of $32,703.13.

The trial judge concluded (1) that "[n]o bonds . . . having been issued . . . by the Commonwealth, interest was not a cost item in the construction and [was] not due under the bond interest clause"; (2) that the payment by the authority to the Commonwealth "was to purchase the [a]irport, not to *construct* it," so that the rate of interest paid by the authority is now irrelevant; (3) that the interest rates on bonds issued by the Commonwealth for other purposes, or that the Commonwealth might have received on short term investments of its general funds, are also irrelevant; and (4) that, since the payments made by East Coast were without prejudice and were not required by the bond interest clause, the amounts of these payments should be repaid.

The principal issue is whether the rent to be paid under the lease was to include any amount for interest on the cost of construction of the buildings, if the Commonwealth itself did not borrow money to finance the construction, thus establishing a rate of interest. The judge's subsidiary findings of fact are well justified by the evidence. We must determine whether he has correctly interpreted the written lease as amended, and, upon the correct interpretation, what conclusions are to be drawn from his subsidiary findings.

1. Under the bond interest clause read literally, no interest rate could be determined until the Commonwealth sold bonds to pay the construction costs. We are not required, however, to look at the bond interest clause standing alone. We must interpret that clause in the light of (a) the lease as a whole (see *Ryan* v. *Boston Housing Authy.* 322 Mass. 299, 302; *Richard Clothing Mfg. Co.* v. *Gutstein-Tuck,*

*Inc.* 328 Mass. 386, 389), (b) the circumstances and background of its negotiation and execution (see *Radio Corp. of America* v. *Raytheon Mfg. Co.* 300 Mass. 113, 117), and (c) the purpose of the bond interest clause (see *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co. Inc.* 317 Mass. 652, 654; *Spaulding* v. *Morse,* 322 Mass. 149, 152–153; see also *Warren* v. *Merrifield,* 8 Met. 93, 96) as an element in determining the rent to be paid by the lessee. See Restatement: Contracts, §§ 230, 235, 236 (a), (b), (d), and (f); Corbin, Contracts, §§ 535, 536, 537, 540, 541, 545, 549; Williston, Contracts (3d ed.) §§ 610, 610A, 610B, 618, 619, 629. The relevant evidence is largely documentary. There is essentially no dispute about the basic facts found by the judge, so we are in as good a position as he was to decide the case. See *Skil Corp.* v. *Barnet,* 337 Mass. 485, 488. We "may draw our own inferences . . . from the basic facts . . . without deference to any inferences which might have been drawn by the trial judge." *Corkum* v. *Salvation Army of Mass. Inc.* 340 Mass. 165, 166–167.

The statutes (St. 1955, c. 769, §§ 1, 2; St. 1958, c. 310, § 3; see fns. 1, 2, *supra*) required that the rent be sufficient to amortize the cost of the buildings, including interest on the bonds, so that the Commonwealth by the end of the term would be made whole for its expenditure. The statutes did not expressly provide that the rent might include an amount for interest in the apparently unexpected event that the Commonwealth did not have to borrow to pay for the construction.[5] Nevertheless, the statutes contained no prohibition, in that event, of such an interest component of the rent. We think that the statutes merely prescribed a minimum rent.

---

[5] Statute 1955, c. 769, §§ 1, 2, authorized (a) the work and (b) borrowing to pay for it. We have been referred to no appropriation that would permit other Commonwealth funds, including the general fund, to be used (except, perhaps, temporarily) to pay for the construction. See *Singleton* v. *Treasurer & Recr. Gen.* 340 Mass. 646, 649–650. Thus, borrowing could hardly have been avoided if the Commonwealth had continued to own the airport instead of transferring it to the authority, a "public instrumentality" performing "an essential governmental function." The temporary advances of building costs from the general fund seem plainly to have been in anticipation of reimbursement from the proceeds of borrowing.

The Commonwealth itself has not incurred any expense for bond interest.   Thus, if the lease must be interpreted as providing (apart from ground rent) only for the minimum rent permitted by the statute (i.e., enough to reimburse the Commonwealth for what it has in fact paid out), then no interest component of the rent should be charged to East Coast.   Obviously the statutes must be considered in interpreting the amended lease (see *United States* v. *Essley,* 284 F. 2d 518, 520–521 [10th Cir.]; Corbin, Contracts, § 551), but the lease itself is the contract which governs the rights of the parties.   We think that the lease does require more than the statutory minimum rent.

The lease provides for a tripartite rent consisting of (a) amortization, (b) interest, and (c) ground rent.   The amortization and ground rent components are not now in issue. We are concerned only with arts. III (a) (2) and III (a) (4) (ii) of the amended lease providing, as part of each year's rent, one year's interest ''upon the unamortized balance of the cost of construction . . . at a rate equal to the interest rate borne by the [Commonwealth] obligations issued . . . to finance the construction.''   The lease seems to make this payment due from the beginning of the lease, without regard to whether Commonwealth bonds had theretofore been issued.[6]   Only the rate of interest payable appears to have depended on the issue of bonds.   No language of the bond interest clause indicates that East Coast was to be excused from paying the interest component of the rent, prior to the actual issue of bonds, merely because the Commonwealth was able to postpone borrowing and to meet construction costs temporarily out of the general fund.   Any saving of interest in this manner appropriately was for the benefit of the Commonwealth rather than of East Coast.

The record does not suggest that, when the lease became effective on November 17, 1955, the parties contemplated that the Commonwealth would not remain the lessor, or

[6] The parties, by their agreement for an interim rate of interest pending the issue of bonds, seem thus to have construed the lease.   See *Maxwell-Davis, Inc.* v. *Hooper,* 317 Mass. 149, 151–152; Corbin, Contracts, § 558.

that no Commonwealth bonds would be issued to pay the cost of construction. Without mentioning the possibility that bonds would not be issued, the rent was fixed to include, as one component, interest on the unamortized balance of construction cost from the beginning of the lease. We see in the fortuitous reimbursement of the Commonwealth for all its construction expenditures by the authority no reason why East Coast should thereafter receive a lower rent than it agreed to pay (and, in effect, be unjustly enriched by a windfall) simply because the Commonwealth did not issue the bonds prior to the transfer. The authority, as successor to the original lessor's interest, had to borrow to pay the purchase price of the airport. If East Coast is not to gain an unearned benefit, the authority should receive the same rent that the Commonwealth would have received, had it remained as lessor, if that result is permitted by the language of the lease.

The bond interest clause of the amended lease, in any event, cannot be interpreted to require East Coast to pay the rate of interest (4.75%) paid by the authority upon its revenue bonds. The transfer of the airport (pursuant to St. 1956, c. 465) to the authority, to be sure, was to a "public instrumentality," but the authority was not the Commonwealth. The record shows (as any investor would know) that the authority was not able in 1958 to borrow on revenue bonds (see fn. 4, *supra*) at as favorable an interest rate (2.25% to 3.5%, see fn. 3, *supra*) as the Commonwealth is now paying upon its general obligations issued in the months just prior to the transfer. The bond interest clause required East Coast as lessee to pay only the interest rate paid by the Commonwealth on its own general obligations which were to have been issued for this purpose.

There would be no unfairness, however, in charging the lessee, throughout the term of the lease, with the rate paid on the Commonwealth's bonds if those bonds in fact had been issued for this airport purpose prior to the sale of the airport. There is also no unfairness in charging the lessee with interest at the rate which the Commonwealth would

have been obliged to pay if it had issued such bonds at the appropriate time, if that rate can be determined with reasonable accuracy. Although the stipulated measure of the interest component in the rent never came into existence, an equivalent measure can be reasonably determined indirectly, in view of the circumstance (see fn. 3, *supra*) that the Commonwealth issued its own general obligation bonds for other purposes in an aggregate amount of over $118,000,000 in April and September, 1958. We do not view the provision of the bond interest clause fixing the interest rate as a condition precedent (see Corbin, Contracts, § 1362; cf. *Alvord* v. *Cook,* 174 Mass. 120, 124; *McCarthy* v. *Daggett,* 344 Mass. 577, 579) to East Coast's liability to pay the interest component of the rent. Accordingly, we hold that it will be consistent with the purpose of the lease to fix that interest rate at the rate in fact paid by the Commonwealth on its most nearly comparable bonds.

East Coast will be charged, as part of its rent, with interest upon the unamortized cost of the buildings at the weighted average rate paid by the Commonwealth upon its obligations issued between April 1, 1958, and the transfer of February 17, 1959, the period during which (on the basis of the judge's subsidiary findings) it seems probable that the Commonwealth would have issued the bonds, if the airport sale had not been in prospect. This weighted average interest rate will be determined by dividing (a) one year's interest on all the Commonwealth bonds issued during the period, by (b) the net proceeds received by the Commonwealth from the sale of such bonds. This determination must be made in the Superior Court after further hearing if the parties cannot agree upon the computation.

The result that we reach is consistent with the minimum rent requirements of the applicable statutes (see fns. 1, 2, *supra*). Under the changed conditions resulting from the creation of the authority, it carries out, as closely as may be, the expectations of the original parties to the lease. The authority, as assignee of the Commonwealth's interest, although it is not the Commonwealth, is a public instru-

mentality which, so far as is feasible and as is fair to East Coast, may reasonably be placed in the same position as the Commonwealth.

2.   The judge justifiably found that East Coast made all its payments of the interest component of its rent under the amended lease without prejudice pending determination of the rate of interest to be paid by the Commonwealth on its bonds.   The Commonwealth and the authority were thus in agreement that these tentative payments were not final, and that they were subject to later adjustment and refund, if they turned out to be excessive.   To the extent that these payments exceeded the amount in fact due from East Coast in accordance with the principles stated in this opinion, East Coast may now recover them from the Commonwealth and the authority, respectively.

3.   The final decrees are reversed and the cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*