WACHUSETT NATIONAL BANK *vs.* ANSTIS R. M.
FAIRBROTHER & others.

Worcester.   October 3, 1888. — January 2, 1889.

Present: MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & KNOWLTON, JJ.

*Promissory Note* — *"Residence"* — *Indorser* — *Notice of Non-payment.*

A married woman while residing with her husband at her mother's house in F.,
which had been her early home, indorsed a note, and subsequently, before sailing
for his home in England, and not intending to return to F., went with him to the
seaside for their child's health, leaving behind their baggage packed for for-
warding directly to the steamship.  The child became ill and died at the sea-
side on Sunday, and they returned to F. on Monday to bury it from her mother's
house, sleeping there, but taking their meals at the house of a notary who was
a neighbor, till the funeral on Wednesday, when, with the notary's knowledge,
they went to the house of another friend and there stayed till Friday.  The note
matured on Wednesday, and in the evening the notary protested the note for
the holder, a local bank, and the next morning duly deposited a notice of non-
payment, postage prepaid, in the post-office of F., directed to the defendant at
her mother's house, which had been her customary address while in F.  Upon re-
turning to her mother's house on Friday for a temporary purpose prior to return-
ing to the seaside, she received the notice.  *Held,* that F. was the best residence
she then had for the purpose of receiving notice, and that the notice was prop-
erly sent to her by mail to her mother's house.

CONTRACT upon certain promissory notes, dated February 21,
1887, and payable six months after date, made by the Snow
Cattle Company, and indorsed by Anstis R. M. Fairbrother,
David A. Corey, and Margaret P. Snow.  Anstis R. M. Fair-
brother alone defended.  Writ dated August 26, 1887.

At the trial in the Superior Court, before *Barker,* J., the only
material issue was as to the sufficiency of certain notices of non-
payment to charge the defendant as indorser.  It appeared that
the defendant, for some time prior to 1885, resided at 82 Blos-
som Street, in Fitchburg, which was also her early home, with
her mother and her sister and the latter's husband.  In 1885
she went to New Zealand, and was there married to an English
clergyman named Fairbrother, who was living there as a mis-
sionary.  Subsequently she and her husband left New Zealand,
having sold their furniture and shipped their household linen to
England, and arrived at Fitchburg on September 21, 1886, and

went immediately to 82 Blossom Street, where a child was born to them in November, 1886, and where they remained until June, 1887, paying their share of the household expenses.

There was also evidence, the material part of which was controverted, tending to show the following facts. In June, 1887, the defendant and her husband formed the purpose of going to England, to his home, with no intention of returning to Fitchburg, or to this country, to live, and with this end in view they packed their baggage, consisting mainly of personal effects, curiosities, and articles of *vertu*. On June 16 they left Fitchburg, and went with the rest of the family to a cottage at Martha's Vineyard for the sake of the child's health, leaving a portion of their baggage at 82 Blossom Street, with directions for a servant, who remained in the house for the summer, to put addresses, which they had prepared, on the baggage as soon as they had decided on what day they should sail, and to meet them with the baggage at Boston before they should sail. After their arrival at Martha's Vineyard, they concluded to make their voyage in July, when their child was taken ill, and they postponed their time of sailing to August 25, for which time they procured tickets. On Sunday, August 21, the child died, and on the Monday following the entire party returned to Fitchburg, bringing with them the child's remains for burial, this being the sole object and occasion of their return. On their arrival, they went with the remains to 82 Blossom Street, and opened the sleeping rooms and the parlors for the purpose of having the funeral there. A notary, who lived next door and was intimate with the entire family, invited them all to take their meals at his house during their stay, which invitation they accepted and availed themselves of. The notary and his wife had just visited at the same cottage at Martha's Vineyard, and knew of the purpose of the defendant and her husband to go to England. The funeral services took place at 82 Blossom Street on Tuesday, and the burial, which was postponed on account of rain, took place on Wednesday. After the burial, the defendant and her husband accepted an invitation from a Mr. Kimball to pass the rest of their stay in Fitchburg at his house. On Wednesday evening the notary asked where the defendant and her husband were, and was informed that they had gone to Mr. Kimball's for a

visit, and had sent their thanks for the hospitality they had received.

The note matured on Wednesday, and in the course of the same evening the notary was called upon by the cashier of the plaintiff bank, which was located in Fitchburg and was the holder of the notes, to protest them, which he proceeded to do. On Thursday morning the notary went to his office and wrote notices of non-payment for the defendant, put them into an envelope, and about eleven o'clock A. M. deposited the envelope, postpaid, in the general office in Fitchburg, the envelope being addressed, "Mrs. Anstis R. M. Fairbrother, 82 Blossom Street, Fitchburg, Mass." There was a postal carrier system for the delivery of letters in Fitchburg, by which letters for the defendant's mother and sister, including those for the defendant since her return from New Zealand, had been delivered; but as the husband of the defendant's sister had a lock-box in the post-office, it had been the custom to put the letters for the entire family in such box after the final carrier delivery of each day. During the summer, while the family was at Martha's Vineyard, all letters were directed to be forwarded there; but upon their return to Fitchburg for the funeral, directions were given by the defendant's sister not to forward them. When the envelope, after its deposit in the post-office, came into the hands of the carrier whose route included 82 Blossom Street for the afternoon delivery of Thursday, he handed it back to the distributing clerk with the remark that "directions had been given not to send mail matter to the house." The letter was subsequently taken from the lock-box, either Thursday evening or early Friday morning, and taken to 82 Blossom Street, and there placed on a mantelpiece. On Friday morning the defendant and her husband, having stopped meanwhile at Mr. Kimball's, went to 82 Blossom Street merely to get a portmanteau, and while they were there the defendant's sister took from the mantelpiece the envelope containing the notices and handed it to the defendant's husband, who opened it, found the notices, and communicated the fact to the defendant, this being the first actual notice she had received. The defendant's agent, anticipating the protest, had on Thursday morning before eight o'clock A. M. gone to the post-office and inquired for a letter for the defendant, and,

finding none, went to Boston that day, and received no notice of the protest of the notes. On Saturday the defendant and her husband returned to Martha's Vineyard, whence they returned to 82 Blossom Street about September 15, 1887, and remained there, on account of the bringing of this action, to the latter part of November, 1887, when they went to England, having had their tickets transferred to another steamship.

At the close of the evidence, the judge ruled, against the defendant's objection, that the notice proved was sufficient to charge the defendant as indorser, and ordered a verdict for the plaintiff; and the defendant alleged exceptions.

*W. S. B. Hopkins,* for the defendant.

*T. G. Kent,* (*H. C. Hartwell* with him,) for the plaintiff.

C. ALLEN, J. Prior to the St. of 1871, c. 239, now embodied in the Pub. Sts. c. 77, § 16, the holder of a note could not give notice of its dishonor through the mail to an indorser who lived in the same city or town, but must give the notice to him personally, or at his place of business or residence. The chief object of the statute was to extend the privilege of giving notice by mail to cases where the parties live in the same place. But in ascertaining the residence of a person to be notified, the same rules are applicable under the statute as would have been applicable prior to the statute in case the holder of the notes had lived in Worcester and the indorser in Fitchburg. The statute did not undertake to give a new definition of "residence," nor to change the rules of law already established as to what should be sufficient to constitute a residence for the purpose of giving or receiving notice in such cases.

Residence is not a word of uniform significance, but is used in different senses. Residence for the purpose of taxation implies more permanency of abode than residence for the purpose of notice of the dishonor of a note. See *Lee* v. *Boston,* 2 Gray, 484, 490; *Borland* v. *Boston,* 132 Mass. 89, 93, 95. We have only to consider what constitutes a residence for the latter purpose.

It is well settled that there may be a residence sufficient for this purpose, although the person has his home elsewhere. *Chouteau* v. *Webster,* 6 Met. 1. *Young* v. *Durgin,* 15 Gray, 264. There may indeed be a sufficient residence without actually living in the place at all, as where one is accustomed to receive his

letters at a post-office in another town from that in which he lives. Notice sent to him at his usual post-office address is considered to be a notice to him at his residence. *Chouteau* v. *Webster*, 6 Met. 1, 6, 7. *Bliss* v. *Nichols*, 12 Allen, 443, 445. *Shelburne Falls National Bank* v. *Townsley*, 102 Mass. 177. *Bank of Columbia* v. *Lawrence*, 1 Pet. 578. And if one is accustomed to resort to several different post-offices, neither of which is in the town where he lives, it has been considered that a notice addressed to him at either one will be good. *Bank of United States* v. *Carneal*, 2 Pet. 543. *Cabot Bank* v. *Russell*, 4 Gray, 167. Story on Notes, § 343.

So also one may have two residences at the same time, notice to him at either of which will be good; as if one is living alternately at two places during the year, going frequently from one to the other. Story on Notes, § 343. And it has often been held that an abandoned residence may be considered as still subsisting, if no new residence has been established, and if the holder of the note does not know of the change. *Bliss* v. *Nichols*, 12 Allen, 443. *Importers & Traders' National Bank* v. *Shaw*, 144 Mass. 421. *Bank of Utica* v. *Phillips*, 3 Wend. 408. *Saco National Bank* v. *Sanborn*, 63 Maine, 340. And if it is known that an indorser has abandoned his residence, and if, upon reasonable inquiry, the place of present residence cannot be ascertained, no notice at all need be given. *Blakely* v. *Grant*, 6 Mass. 386. Story on Notes, § 316.

From these and other authorities which might be cited, it abundantly appears that the word "residence," in the law of negotiable instruments, is not used in a strict sense as necessarily implying a permanent, exclusive, or actual abode in the place, but it may be satisfied by a temporary, partial, or even constructive residence. The law does not require of the holder of a note the highest and strictest degree of diligence in giving notice, but only such a degree of reasonable diligence as will ordinarily bring home notice to the party. *Bank of United States* v. *Hatch*, 6 Pet. 250, 257. Less diligence is required in ascertaining the residence for the purpose of giving notice than for the purpose of making a demand of payment. *Young* v. *Durgin*, 15 Gray, 264.

Applying these general views to the case at bar, we are satis-

fied, in the first place, that the defendant had a sufficient residence to entitle the holder of the notes to give notice of their dishonor to her through the mail. It may be conceived that, in a given case, a person might remain so transiently in different places that no one of them could be called his residence, and that no notice except a personal one could be given to him; but such is not this case.

We are, then, to consider where the defendant's residence was on the day of her child's burial, and on the succeeding day. The defendant has stated the facts in the bill of exceptions as she contended that the facts were. Some of them were controverted by the plaintiff, but in this inquiry she is entitled to the benefit of having it assumed that they actually were as she contended that they might be found to be by a jury. And looking at them even in this manner, we are unable to see that the notice of dishonor could as properly have been sent to her at any other place as where it was sent. She certainly had gained no residence in England. Her brief and casual visit to Mr. Kimball's gave her no residence in his house; her counsel so concedes and contends. She probably had a sufficient residence in Martha's Vineyard while she was actually there; but she gained no domicil, and had no intention of making a permanent residence there. She went there for a temporary purpose, having no intention of returning to Fitchburg, because she intended to go to England; but this plan was broken up for the time by the sickness and death of her child. There was nothing to show that Martha's Vineyard was to be deemed her residence except while she was personally there. When she returned to Fitchburg, it was not as to a new or strange place, but it was the place of her early and her recent home. Unless she had gained a new residence elsewhere, that would be a good residence for the purpose of notifying her of the dishonor of a note. It appears also to have been her principal and customary address for letters by mail. For the purpose of receiving notice, Fitchburg must be considered as the best residence she then had. If her residence was not there, she had no residence, and in that case notice, if sent at all, might properly be sent to her in Fitchburg, and her proper address in Fitchburg was at 82 Blossom Street, where the notice was sent.                         *Exceptions overruled.*