JEANETTE P. SHEPARD *vs.* FINANCE ASSOCIATES
OF AUBURN, INC.

Hampden.    February 7, 1974. — August 21, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Contract,* Performance and breach.  *Truth-in-Lending Act.  Rescission.  Tender.  Statute,* Construction. *Words,* "Residence."

Even assuming the allegations of a bill in equity seeking to rescind a credit transaction were sufficient to support the contention that the defendant was either conducting an unauthorized banking business or was leading the public to believe it was a bank in violation of G. L. c. 167, a demurrer to the bill as to this ground was properly sustained inasmuch as rescission of private contractual transactions is not a remedy provided for violation of G. L. c. 167.  [188]

In a credit transaction secured by real property used or expected to be used as the borrower's principal residence, the borrower's right to rescind under G. L. c. 140C, § 8 (a), is continually effective until he is given the notice required by § 8 (b).  [188-189]

Where the plaintiff in a suit in equity to rescind a credit transaction secured by a mortgage on her home had left Massachusetts several months before the transaction, living for short periods in various States without acquiring any new residence other than of a temporary nature, where she had stated that she was moving and did not intend to return to Massachusetts, where she had not rented her home nor removed the bulk of her possessions from it, and where on a similar agreement with the defendant made two months before the transaction in question she had listed the Massachusetts home as her

address, that home was her "principal residence" within the meaning of G. L. c. 140C, § 8 (a). [189-194]

The fact that the plaintiff, having rescinded a credit transaction under G. L. c. 140C, § 8 (a), on the same day brought suit against the defendant for rescission and damages, thus impliedly refusing to comply with the procedures following rescission established by § 8 (d) requiring her to tender the money borrowed to the defendant, excused the defendant from returning the plaintiff's note and cancelling its security interest in her property, but did not excuse it from its obligation to recognize the validity of the rescission. [194-195]

Where two notes were discharged before commencement of litigation to rescind a credit transaction and no payment had ever been made on them, the lender was not subject to civil liability under G. L. c. 140C, § 10 (b), for having failed to make the disclosures required by § 8 (b). [195]

Where the lender's failure to make the disclosures required by G. L. c. 140C, § 8 (b), enabled the borrower to rescind a credit transaction and pay no finance charge, the lender's liability under § 10 (b) was limited to the mandatory minimum and reasonable attorney's fees. [195-196]

BILL IN EQUITY filed in the Superior Court on May 7, 1971.

The suit was heard by *Bennett,* J.

*Louis Kerlinsky* for the plaintiff.

*William J. Ledoux* for the defendant.

HENNESSEY, J.   This case arises out of a series of credit transactions during 1970 in which the defendant lent a total of $15,000 to the plaintiff, evidenced by three successive notes secured by mortgages on a home owned by her.

By a bill in equity the plaintiff later sought to rescind and render void this transaction on two separate grounds. First, she alleges that at the time of these loans the defendant was engaged in the banking business in violation of provisions of G. L. c. 167[1] and that, accordingly, the instruments executed were illegal and void. Second, she alleges that the Massachusetts statute popularly known as the Truth-in-

---

[1] General Laws c. 167, § 12, as amended through St. 1965, c. 154, provides in relevant part: "No domestic or foreign corporation or individual, partnership or association shall conduct the business of a savings bank, co-operative bank, savings and loan association, credit union, trust company or banking company unless authorized to do so under the laws of this commonwealth nor . . . solicit or receive deposits or transact any business whatsoever . . . in any manner so as to lead the public to believe . . . that its business is that of a bank."

Lending Act, G. L. c. 140C,[2] inserted by St. 1969, c. 517, § 1, requires that in transactions of this type the consumer be given certain notices prescribed by § 8, and that as the required notices were not given the transaction may be rescinded and the penalties provided in § 10 of that act received from the lender.

As to the first ground, a demurrer was sustained by the trial judge. After the case was heard on the merits, the judge made a report of material facts, made rulings of law, and ordered that a decree should be entered dismissing the plaintiff's bill. Resolution of the second issue depends on

---

[2] The relevant sections of that law read in material part as follows: Section 1: "For the purposes of this chapter, the following words shall, unless the context indicates otherwise, have the following meanings: . . . (y) 'Residence,' any real property in which the customer resides or expects to reside, including a parcel of land on which the customer resides or expects to reside."

Section 8 (a) "Except as otherwise provided in this section, in any credit transaction in which a security interest is or will be retained or acquired in any real property which is used or is expected to be used as the principal residence of the customer, the customer shall have the right to rescind that transaction until midnight of the third business day following the date of consummation of that transaction or the date of delivery of the disclosures required under this section and all other material disclosures required under this chapter, whichever is later, by notifying the creditor by mail, telegram or other writing of his intention to do so."

Section 8 (d): "If a customer exercises his right to rescind under subsection (a), he shall not be liable for any finance or other charge, and any security interest shall become void upon such rescission. Within ten days after receipt of a notice of rescission, the creditor shall return to the customer any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the customer, the customer may retain possession of it. Upon the performance of the creditor's obligations under this section, the customer shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the customer shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the customer, at the option of the customer. If the creditor shall not take possession of the property within ten days after tender by the customer, ownership of the property shall vest in the customer without obligation on his part to pay for it."

Section 10 (b): "Any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this chapter or any rule or regulation made thereunder by the commissioner to be disclosed to that person shall be liable to that person in an amount equal twice the amount of the finance charge in connection with the transaction, except that the liability under this clause shall not be less than one hundred dollars nor more than one thousand dollars, and in the case of any successful action to enforce such liability, a reasonable attorney's fee as determined by the court, but a creditor may not be held liable in any action brought under this subsection, if he shows by a preponderance of evidence that such violation was not intentional and resulted from a bona fide error in a mathematical computation, or in the layout or format, size of type or order of clauses contained in such disclosure statement."

whether, on the facts stated below, the house which served as the security for the loans was, at the time of the last transaction, the principal residence of the plaintiff or was expected to be so used in the future.

The judge found that the house was not such principal residence. As we hold that it was, we reverse the decree and order that a new decree shall be entered declaring the transaction void.

Several collateral issues are also raised in this appeal but need not be decided in light of our disposition of the main issues.

We state the relevant facts as found by the judge in his report of material facts and as appearing in the documentary record. From 1958 the plaintiff and her husband and four children lived in the city of Westfield at 117 Valley View Drive in a house constructed by them. The remainder of the family continued to live there for some time after the husband's death. At a time early in 1970 or late in 1969 the plaintiff with her children moved away from the house to temporary quarters in a motel in Farmington, Connecticut, in order to escape what she felt was "harassment" from certain citizens of Westfield. She withdrew her children from the Westfield schools and enrolled some or all of them in Connecticut schools.

By May, 1970, the plaintiff was indebted to the motel management for rent for at least $600, and the motel operator was threatening to evict her and her children and seize what personal property she had at the motel. She then contacted a mortgage broker and informed him that she needed $5,000 immediately for a new car and for living expenses until the following September, when she would begin a teaching job she had obtained in Nova Scotia. She stated that she was unwilling to enter Massachusetts to obtain the loan. Nevertheless, after the broker contacted the defendant, a loan to the plaintiff was ultimately arranged at a meeting near Springfield, Massachusetts, on May 13.

At this meeting the plaintiff was represented by Mr. Berstein, an attorney she had selected through the yellow

pages of the telephone book. One Bertucio, the principal owner and operator of the defendant, and his attorney were also present. The parties agreed to a loan in the principal sum of $8,000, of which $2,310 would be turned over to the plaintiff that day and most of the remainder held by Mr. Berstein to clear the Westfield property of outstanding encumbrances. The loan was to be secured by a mortgage on this property. The plaintiff signed a purported waiver of her right to rescind the transaction under G. L. c. 140C, § 8, but was not given the form of notice required by § 8 (b).

The plaintiff then returned to Connecticut and purchased another car, which she registered in that State and on which she has since continued to make payments. She called Mr. Berstein on May 28 from somewhere in Maine and discharged him as her attorney. She also advised him that she could not come back to Massachusetts but that she intended to hold-on to the house in Westfield. Despite his dismissal, Mr. Berstein then arranged the discharge and release of all encumbrances and remitted the balance to the plaintiff, minus the agreed fee, to an address which does not appear in the record.

Shortly thereafter the plaintiff arrived in Nova Scotia without funds. She had made numerous calls to Bertucio attempting to arrange a further loan. She insisted that she would not go to Springfield to arrange the loan but that it would have to be made at Worcester. On June 3 a second loan of $2,000 was made to the plaintiff at Worcester, secured by a second mortgage on the house in Westfield. Unlike the prior and subsequent notes, on which the line for the borrower's address was left blank, the note for this loan has the address "117 Valley View Dr." typed in. The form indicates it was prepared by the defendant's attorney; presumably this information was furnished by the plaintiff. Another purported waiver of the right to rescind was secured by the defendant, but again the required notice was not given.

After receiving the net proceeds of the loan, the plaintiff spent the summer traveling with her children to "various places attending seminars," including a seminar some-

where in Vermont. This was done, according to the plaintiff, to avoid harassment in Westfield.

In mid-August the plaintiff called the defendant's attorney from Maine and advised him that she was out of funds and needed an additional loan. It was arranged that she would borrow an additional $5,000 from the defendant, and this was accomplished on August 17, 1970. The new loan was cast in the form of a consolidated loan, operating to discharge the notes of May 13 and June 3 and rewriting the transaction into a new note. Thus the status of the parties on this crucial date of August 17 determines their present rights. The total principal amount of the third note is $15,000; it is secured by a first mortgage on the Westfield property; bears interest at the rate of one and one-half per cent a month; and is payable over a term of five years but permits prepayment without penalty. A third purported waiver of the right to rescind was signed but, once again, without the requisite notice under G. L. c. 140C, § 8. No payments have ever been made on this note.

While negotiating the details of this loan, the plaintiff told Bertucio that she had a one-year teaching contract in Nova Scotia. She also told the defendant's attorney that she was moving and would not return to Massachusetts.

Thereafter the plaintiff traveled through New England for about two weeks, reaching Nova Scotia before September 5. She began her teaching job but quit on October 15. After a period of hospitalization in Washington, D. C., she returned to the house in Westfield to live with her married daughter who had moved in previously but subsequent to the August loan. She has since moved to Connecticut, and her married daughter continues to live in the Westfield home.

It appears that from the time the plaintiff first moved out until at least August 13 the house in Westfield was not lived in. However, it also appears that the plaintiff during this period took no step toward disposing of the house; she did not remove the bulk of her possessions; and she did not move into any other quarters on any more than a temporary basis.

1. The plaintiff urges that the notes and mortgages are void because the defendant was conducting a "banking business" in violation of G. L. c. 167. As the trial judge sustained the defendant's demurrer to this argument, we must assume on appeal that all facts well pleaded are true. However, a demurrer does not admit conclusions of law in the pleadings. *Morin* v. *Ellis,* 285 Mass. 370, 374 (1934). *Mairs* v. *Madden,* 307 Mass. 378, 380-381 (1940). It is not at all clear that the relevant sections of the original bill, once conclusions of law are deleted, suffice to support the contention that the defendant was either conducting an unauthorized banking business or "lead[ing] the public to believe" it was a bank. Nevertheless, we assume for the purpose of this appeal that the bill was sufficient to make out this charge.

Even so, the plaintiff is afforded no basis for relief. Chapter 167 affords a specific remedy for its violation, beginning with an examination by the Commissioner of Banks and culminating in possible fines, assessment of expenses, and injunctive orders. G. L. c. 167, § 13. No mention is made of any effect on the private transactions entered into by an offending corporation. We are unwilling to assume that the Legislature intended to effect such a forfeiture of private contractual rights. Cf. *Union Natl. Bank* v. *Matthews,* 98 U. S. 621 (1878); *National Bank* v. *Whitney,* 103 U. S. 99 (1880). That the Legislature expressly announced that intention in an analogous but different context confirms our resolve in this regard. G. L. c. 140, § 110. The demurrer was properly sustained.

2. The plaintiff's other ground for arguing that the transactions are void is that they were properly rescinded under G. L. c. 140C. That chapter, which regulates consumer credit transactions, provides in § 8 (a) that where such a transaction will lead to the retention or acquisition of a security interest in "any real property which is used or is expected to be used as the principal residence of the customer, the customer shall have the right to rescind that transaction until . . . the date of delivery of the disclosures

required under this section and all other material disclosures required under this chapter."

The judge found, and his finding is not challenged in this court, that the plaintiff was not given "the form of notice required by Chapter 140C, Section 8 (b)." Accordingly, if the house at 117 Valley View Drive was, on August 17, 1970, used as the principal residence of the plaintiff or was expected to be so used at any time in the future, c. 140C must be held to apply and the plaintiff's attempted rescission must be held to be effective.

This date (August 17, 1970) is crucial as it represents the time when the earlier notes were discharged and the new, consolidated note was signed. As the statutory disclosure was never made, the right to rescind, if the chapter was applicable, was continually effective. The plaintiff purported to rescind by a letter received by the defendant on May 7, 1971. She filed the instant suit on the same day in an attempt to establish her right to do so.

The judge found that the house was not the plaintiff's principal residence. While ordinarily in equity "the findings of a judge made on oral testimony are not to be reversed unless they are plainly wrong," *Russell* v. *Meyers,* 316 Mass. 669, 672 (1944), where there is essentially no dispute as to the basic facts found, we may draw our own inferences from these facts without deference to the inferences which may have been drawn by the trial judge. *Corkum* v. *Salvation Army of Mass. Inc.* 340 Mass. 165, 166-167 (1959). *East Coast Aviation Corp.* v. *Massachusetts Port Authy.* 346 Mass. 699, 705 (1964). *Peters* v. *Archambault,* 361 Mass. 91, 100 (1972) (Tauro, C.J., dissenting). We conclude that whether the house in Westfield was the plaintiff's "principal residence" at the relevant time is actually a mixed question of law and fact which the judge resolved in the negative based on his interpretation of the legal meaning of that term and on the inferences he drew from the basic facts he found. We therefore proceed to reëxamine this question in light of these facts, but free to draw our own inferences.

The main lesson to be drawn from our cases interpreting the meaning of the word "residence" is that it is a word "of flexible meaning." *Cambridge* v. *West Springfield,* 303 Mass. 63, 66-67 (1939). "Residence is not a word of uniform significance, but is used in different senses." *Wachusett Natl. Bank* v. *Fairbrother,* 148 Mass. 181, 184 (1889). While some cases have seemed to construe the word as the practical equivalent of domicil, implying physical presence coupled with an intention to remain, *Commonwealth* v. *Bogigian,* 265 Mass. 531 (1929); *Jenkins* v. *North Shore Dye House, Inc.* 277 Mass. 440 (1931), others have stressed that there is a distinction between the two concepts. *Briggs* v. *Rochester,* 16 Gray 337, 338 (1860). *Martin* v. *Gardner,* 240 Mass. 350, 353 (1922). See generally, *Marlborough* v. *Lynn,* 275 Mass. 394 (1931).

There is no point in attempting to analyze in detail any of these numerous attempts at definition, as the meaning of the word clearly varies with the statute in which it is used, and particularly the purpose of that statute, and this is the first time we have construed the term "residence" under G. L. c. 140C. " 'Resided,' like most other words may have different meanings or shades of signification dependent upon the connection in which it occurs and the result designed to be accomplished by its use." *Marlborough* v. *Lynn, supra,* at 396-397. The meaning of the term "residence" has been held to depend "upon the phraseology of the particular statute, the relation of the term to the remaining words employed, and the aim and object intended to be accomplished by the Legislature." *Cambridge* v. *West Springfield, supra,* at 67.

Our point of departure is, therefore, the statute itself. While G. L. c. 140C, § 1 (y), defines "residence" as "any real property in which the customer resides or expects to reside, including a parcel of land on which the customer resides or expects to reside," the circularity of this definition largely robs it of utility. Section 8 (a) creates in the customer a right to rescind whenever, as a result of the credit transaction, there will be a security interest in "any real property which is used or is expected to be used as the principal

residence of the customer." The insertion of the word "used" does not appear to have substantive implications but was doubtless a matter of grammatical and semantic convenience. Also, if the house in question was the plaintiff's residence, there would seem to be little question that it was her principal one. There is no suggestion in the record that she had any other.

More helpful and, indeed, determinative of the issue, in our view, is a consideration of the purpose of the statute. Legislative history is so scanty as to be of no assistance. However, we observe that c. 140C is quite clearly a consumer protection statute. As such it is to be liberally construed to effectuate its remedial purpose. *Shea* v. *Peters,* 230 Mass. 197 (1918). We note that the equivalent Federal statute has also been given a liberal construction for this reason. *N. C. Freed Co. Inc.* v. *Governors of Fed. Reserve Sys.* 473 F. 2d 1210, 1214 (2d Cir. 1973), cert. den. 414 U. S. 827 (1973).

The judge did not undertake to define the term "residence." Nor shall we do so; regardless of our assessment of its definition, it would be inappropriate for us to undertake to define a term already defined by the Legislature. The applicability of this term must of necessity depend on the facts of each case. On the particular facts before us and with regard to the principle of liberal construction on behalf of the consumer, as stated above, we conclude that on August 17, 1970, the Westfield home was indeed the plaintiff's principal residence and, moreover, that at that time she intended so to use it in the future.

The judge found that the house was not being lived in through August 13. It is unclear if this date was an inadvertent error in the record and the intended date was August 17 or whether there is a possibility that the plaintiff may actually have inhabited the house between those two dates. Nevertheless, our conclusion is unaffected by any speculation as to where the plaintiff spent the night before she signed the note in question here.

There is nothing in the record to contradict the following description of the plaintiff's status on August 17, 1970. At

that time she had acquired no other residence other than of the most temporary nature. She had not sold the house she and her husband had built and that she had lived in for over ten years. Nor had she rented it out so that anyone else was living in it. Neither had she removed the bulk of her possessions from the home. In identical circumstances two months previous, she had signed a note prepared by the defendant which listed the Westfield house as her address. She had obtained a temporary job in Canada, but that was not to begin for several weeks. While she told the defendant's attorney that she was preparing to move, this statement merely serves to indicate that in her mind she had not yet done so. Because of the harassment she believed she had been subjected to, she felt unable to remain physically in the house for any length of time, but apparently she was constantly taking steps to remove this obstacle.

In light of the protective purpose of c. 140C and the above facts as to the plaintiff's relation to the house in Westfield, it seems appropriate to·conclude that, in so far as she had a home on August 17, 1970, it was at 117 Valley View Drive. It remained her principal residence for the purposes of that statute much as if she had been on an extended vacation. That she perceived obstacles to her return is irrelevant. In this context we note that we have in the past distinguished between "residence" and "actual residence" and defined the latter term to require physical presence. *Sears* v. *Boston,* 1 Met. 250, 251 (1840). Cf. *Marlborough* v. *Lynn,* 275 Mass. 394 (1931); *Cambridge* v. *West Springfield,* 303 Mass. 63 (1939). To the extent that such a distinction is relevant here, we believe that actual residence is not required for the purposes of c. 140C, so long as there is no actual residence in another home. We do not believe that c. 140C was meant to draw such fine distinctions in determining when a consumer's home would be protected. The "principal residence" requirement serves the purpose of excluding homes held for investment or income purposes and all but one home in cases of multiple home ownership. It does not operate to deny protection to a consumer such as

the plaintiff because of her temporary, though extended, absence from the only home she had.

Furthermore, we believe that to effectuate the purposes of the statute in such circumstances as this it must be presumed that the plaintiff intended at some future time to return to live at her house, in the absence of firm objective evidence to the contrary. Such evidence is lacking in the present case.

Though we are, of course, not bound by its interpretation, we are mindful of the opinion of the Federal Reserve Board, the agency charged with administering the nearly identical Federal version of the Truth-in-Lending Act, 15 U. S. C. §§ 1601-1665 (Supp. II 1972), on the subject of future intentions. In its published interpretation letters, the board has pointed out that "there is no provision in the Truth in Lending Act . . . whereby the customer must indicate whether or not he intends to use the property as his principal residence." C.C.H. Consumer Credit Guide, par. 30,804 (F.R.B. letter No. 574, dated February 10, 1972). Thus, the plaintiff's casual statement that she was not returning to Massachusetts, particularly in the absence of any indication of a time span to which that statement may have had reference, need not be regarded as controlling evidence of her intention. More convincing are the objective indicia of her intention and desire to return: the fact that she mortgaged rather than sold the home, that she did not rent it, that she apparently left the bulk of her possessions there, and even that, in attempting to remove what she regarded as the obstacle to living in her own home, she later sought the aid of a United States Senator from Massachusetts. Even assuming a clear intention on her part to live the next several years outside of Massachusetts for this reason, we would nevertheless on these facts regard the Westfield home as her intended future principal residence. In this regard we take cognizance of the Federal Reserve Board's published interpretation that the fact that "land is purchased on a 7 year land contract prohibiting construction of a dwelling until the end of that period would

not by itself, in our opinion, remove the transaction from" the rescission provision of the Federal Truth-in-Lending Act. C.C.H. Consumer Credit Guide, par. 30,399 (F.R.B. letter No. 344, dated June 4, 1970).

In summary, the plaintiff's principal residence on August 17, 1970, was 117 Valley View Drive in Westfield. Moreover, we find that though she was then about to make a temporary move to Nova Scotia, she expected to use that house as her principal residence again at some indefinite time in the future. Accordingly, she had the right under c. 140C, § 8 (a), to rescind her transaction with the defendant within three days or at any time until it provided her with the notice required in c. 140C, § 8 (b). As this notice was never given, her rescission of May 7, 1971, was effective.

3. The Truth-in-Lending Act contemplates that certain procedures are to be followed after a valid rescission. General Laws c. 140C, § 8 (d), provides that "[w]ithin ten days after receipt of a notice of rescission, the creditor shall return to the customer any money or property given . . . and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the customer, the customer may retain possession of it. Upon the performance of the creditor's obligations under this section, the customer shall tender the property to the creditor . . .. If the creditor shall not take possession of the property within ten days after tender by the customer, ownership of the property shall vest in the customer without obligation on his part to pay for it." In terms of the facts of this case and its underlying transaction, the defendant should by May 17, 1971, have returned the plaintiff's note of August 17, 1970, and taken steps to cancel its security interest in the Westfield property. The plaintiff should thereupon immediately have tendered the $15,000 she had borrowed.

These procedures were unfortunately not followed, and we must therefore seek now to determine the parties' current rights. The defendant urges that it was excused from performance, at least temporarily, under § 8 (d) by

virtue of the plaintiff's having brought suit on the same date that she rescinded her transaction. We agree. By filing her suit the plaintiff averred that not only was she not liable to return the $15,000 she had borrowed but also that the defendant owed her $3,000 damages plus attorney's fees. The clear implication was that she would refuse to comply with the provisions of § 8 (d) and tender the $15,000 should the defendant return the note and cancel its security interest. "[T]he law does not require a party to tender performance if the other party has shown that he cannot or will not perform." *Leigh* v. *Rule,* 331 Mass. 664, 668 (1954). *Vander Realty Co. Inc.* v. *Gabriel,* 334 Mass. 267, 270-271 (1956). *Mayer* v. *Boston Metropolitan Airport, Inc.* 355 Mass. 344, 354 (1969).

Though the defendant's refusal to make tender was thus reasonable in the circumstances, its refusal to recognize the validity of the rescission was not. As both parties thus failed to follow the statutory procedure, and together caused the extended delay which has occurred, it is appropriate that they now be ordered to do so.

4. The plaintiff also claims $3,000 plus attorney's fees under c. 140C, § 10 (b). That section makes the creditor liable to the customer, after any failure to make a required disclosure, in an amount equal to twice the finance charges, but neither less than $100 nor more than $1,000. Reasonable attorney's fees incurred in connection with enforcing this liability, as determined by the court, are also to be awarded. While the plaintiff seeks the maximum sum for each of the three transactions, we feel such an award would be inappropriate. As no Massachusetts case has interpreted this section and we can find no case from another jurisdiction which offers guidance, we must authoritatively construe it here.

Two of the notes were discharged long before this litigation began, and without any payment ever having been made on either of them. We do not believe the statute contemplated civil liability to ensue from such a transaction, whatever the defects in notice.

As to the third transaction, while liability under § 10 (b) appears to be mandatory, the statutory exceptions being

clearly inapplicable and in any case not relied on by the defendant, we conclude that the defendant's liability is limited to the $100 minimum. The statutory scheme is to tie the civil liability of a nondisclosing creditor to the illicit finance charge he collects. By doubling the liability the statute in effect allows the customer to recover the finance charge he paid and imposes an equivalent charge on the creditor for the temporary use of this money. Because the particular failure of disclosure in this case enabled the plaintiff to rescind the transaction and pay no finance charge whatsoever, she may recover only under the alternative provision for a mandatory minimum.

5. The plaintiff argues several other issues relating to her request for a free copy of the trial transcript and her exceptions to various rulings of the judge. As we have disposed of the major issues in her favor, there is no need to consider these subsidiary questions; their determination could no longer affect the outcome of this case.

6. The decree of the Superior Court is reversed. This case is remanded to that court, where a new decree shall be entered declaring the following, in accordance with the provisions of c. 140C, §§ 8 (d) and 10 (b): That the note and mortgage instrument executed by the plaintiff on August 17, 1970, are rescinded and void; that within ten days or such further time as a judge of the Superior Court may allow, the defendant shall tender to the plaintiff the original note and mortgage and take any necessary steps to reflect the termination of the security interest created under that transaction; that upon such tender by the defendant the plaintiff shall return the $15,000 sum which she borrowed; that the plaintiff shall not be liable for any finance or other charge in connection with this transaction; and finally, that the defendant shall be liable to the plaintiff in the amount of $100 plus a reasonable sum for attorney's fees to be determined by the judge of the Superior Court.

*So ordered.*