Valley Stream Teachers Federal Credit Union *v.* Commissioner of Banks.

VALLEY STREAM TEACHERS FEDERAL CREDIT UNION &
others *vs.* COMMISSIONER OF BANKS & others.

Suffolk. October 5, 1978. — December 18, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Contract,* Performance and breach, Validity. *Public Policy. Corpora-
tion,* Ultra vires. *Commissioner of Banks. Credit Union. Words,*
"Security."

A credit union's failure to obtain the approval of the Commissioner of
Banks to borrow money, in violation of G. L. c. 171, § 16, did not
render the credit union's contractual obligations voidable or bar
restitution inasmuch as rescission of private contractual transac-
tions is not a remedy provided for violation of c. 171. [851-852]

In an action against a credit union seeking restitution of money loaned
to it, the fact that some of the loan proceeds may have been illegally
misappropriated by certain insiders of the credit union was irrele-
vant to the validity of the plaintiffs' contractual claim and did not
preclude an award of summary judgment. [852-853]

In an action against a credit union seeking restitution of money loaned
to it, allegations by the credit union that the plaintiffs had engaged
in certain misconduct in making the loans did not preclude an
award of summary judgment where the plaintiffs' alleged miscon-
duct was so minor in comparison to that of the defendants as to be
immaterial on a motion for summary judgment. [853-855]

In an action against a credit union for breach of contract arising out
of an interlending arrangement between the defendant and other
participating credit unions, the defense of ultra vires was not avail-
able where the parties dealing with the credit union had no actual
knowledge of the abuse of corporate authority, where the defendant
had received the benefit of the bargain, and where the credit un-
ion's potential insolvency did not render the transaction void. [855-
857]

Transactions among a number of credit unions participating in an
interlending arrangement did not constitute sales of or investments
in securities within the meaning of G. L. c. 110A, § 401 (*k*). [857-859]

A security agreement under which a credit union participating in an interlending arrangement with other credit unions pledged a security interest in all of its assets to a bank acting as trustee for the financial trust operating the program was enforceable against the credit union when it defaulted on its loan obligations. [859]

A corporation established under the provisions of G. L. c. 171, app. §§ 1-6, to take possession and control of an insolvent credit union's property and business was not a lien creditor under G. L. c. 106, § 9-301 (3), and did not, therefore, take priority over secured creditors of the credit union. [859-860]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 27, 1976.

On transfer to the Superior Court, the case was heard by *Morse, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Donald J. Wood* (*Frank J. Teague* with him) for Massachusetts Credit Union Share Insurance Corporation & another.

*William A. McCormack, Jr.* (*E. Susan Garsh & Elizabeth K. Ainslie* with him) for Valley Stream Teachers Federal Credit Union & others.

*Harvey Weiner* for Paul J. Phillips & others.

HENNESSEY, C.J. We have before us an appeal brought by the defendants Westover Credit Union (Westover) and Massachusetts Credit Union Share Insurance Corporation (Share Insurance) from a summary judgment entered against them concerning money borrowed by Westover. The controversy at issue arose out of an interlending arrangement participated in by all of the party credit unions. We affirm.

The facts are as follows. Westover is a credit union chartered under G. L. c. 171, § 2, with its principal place of business in Chicopee, Massachusetts. Share Insurance is a statutory corporation created by the appendix to G. L. c. 171. The lending credit unions[1] are all located

_____

[1] The thirteen plaintiff credit unions and the States in which their principal places of business are located are Valley Stream Teachers

outside of Massachusetts and are participants in the ICU Interlending and Commercial Paper Program (Program). The Program was established by ICU Services Corporation (ICU), a Wisconsin corporation, and is operated under a trust known as the ICU Financial Trust. The purpose of the Program is to facilitate the lending of funds in units of $100,000 between participating credit unions throughout the United States. First Wisconsin National Bank of Milwaukee, a national banking association with its principal place of business in Milwaukee, Wisconsin, serves as the trustee of ICU Financial Trust.

Credit unions desiring to participate in the Program are required to send to ICU an "Application and Participation Agreement," along with documents indicating the applicant's financial condition. These documents are forwarded to the ICU Credit Committee. The credit committee has seven days to disapprove the application. Otherwise, the applicant is accepted.

The deed creating ICU Financial Trust requires a participating credit union, prior to borrowing funds through the Program, to grant First Wisconsin a security interest in all of the credit union's assets. Borrowing credit unions are also required to submit at least eight presigned blank promissory notes to First Wisconsin, which is empowered to fill out the notes to authenticate all or part of an interlending transaction. ICU then sets a "borrowing limit" for the credit union. This limit pertains not only to borrowing accomplished through the Program, but to outstanding debt obligations from all other sources as well.

---

Federal Credit Union (New York); IBM Burlington Federal Credit Union (Vermont); LC-DC-F Employees of G. E. Federal Credit Union (Pennsylvania); Bergstrom AFB Federal Credit Union (Texas); Kansas Central Credit Union (Kansas); Community Co-op Credit Union (North Dakota); Finance Center Federal Credit Union (Indiana); MacDill AFB Federal Credit Union (Florida); F. E. Warren Federal Credit Union (Wyoming); Webb AFB Federal Credit Union (Texas); Government Employees Credit Union of El Paso (Texas); Blue Flame Federal Credit Union (New Jersey); and Ellsworth AFB Federal Credit Union (South Dakota).

First Wisconsin's primary function in the Program is to match borrowing and lending requests among member credit unions. Credit unions seeking to borrow through the Program telephone First Wisconsin. First Wisconsin in turn telephones a prospective lender, advising it of the amount sought to be borrowed, the interest or "discount interlending rate" set by ICU, and the maturity date of the loan set by First Wisconsin.[2] Borrowers pay the discount rate to the lending credit union, and a fee to First Wisconsin and ICU as compensation for their services.

Credit unions engaged in borrowing through the Program are required to supplement, on a quarterly basis, the financial information initially submitted with their applications. If a borrowing credit union fails to comply, either First Wisconsin or ICU will telephone the credit union and obtain the information orally. ICU uses this information to update the borrowing limits of participating credit unions. First Wisconsin uses it to prepare "Quarterly Financial and Credit Reports," copies of which are distributed to all lending credit unions.

In January of 1974, Paul Phillips, then treasurer and clerk of Westover, and Myer Goldenberg, then president of Westover, sent an Application and Participation Agreement to ICU. In early February of 1974, ICU accepted Westover as a participant in the interlending program. Between February, 1974 and November, 1975, Westover took out nineteen loans, totalling $2,600,000, from the thirteen plaintiff credit unions. Westover repaid only $200,000 of this amount. The remainder of the loans were either renewed or extended.[3] Only one of these loans was approved by the Massachusetts Commissioner of Banks (Commissioner), pursuant to G. L. c. 171, § 16.

---

[2] Maturity dates of the loans were normally limited to 90 or 180 days. However, First Wisconsin was given discretion to set maturity dates up to 269 days for any particular transaction.

[3] In many instances, at the time of the renewal or extension, a different credit union was substituted as the lender and the original lending credit union was paid.

376 Mass. 845                                                    849

Valley Stream Teachers Federal Credit Union *v.* Commissioner of Banks.

On November 25, 1975, pursuant to G. L. c. 171, app. §§ 1-6, the Commissioner certified to Share Insurance that Westover was in an unsound and unsafe condition to transact the business for which it was organized and directed Share Insurance to take possession and control of Westover's property and business. Share Insurance has operated Westover since that day, subject to the control of the Commissioner. Despite the plaintiffs' demands for repayment as the loans matured, the loans remain unpaid.

On February 27, 1976, First Wisconsin and the thirteen lending credit unions filed a complaint in the Supreme Judicial Court for the county of Suffolk, naming the Commissioner, Westover and Share Insurance as defendants. The plaintiffs sought to recover the monies loaned to Westover and to reach and apply the assets of Westover in the possession of Share Insurance in satisfaction of these debts. Count 1 of the amended complaint sought damages to the lending credit unions for breach of contract, plus the interest, expenses and attorneys' fees due under the terms of the loan agreement. Count 2 sought restitution of money had and received by Westover in the course of the same loan transactions. Count 3 sought specific performance of the security agreement executed by Westover pursuant to the deed of trust. Finally, count 4 sought a declaration that the plaintiffs, as secured creditors, have priority over Westover's shareholders in the event of a liquidation.

On March 26, 1976, Share Insurance filed an answer on behalf of itself and Westover, denying liability and raising various affirmative defenses including illegality, ultra vires, laches and estoppel. The answer also contained a counterclaim which is immaterial to our reasoning in this case. A single justice of this court ordered the case transferred to the Superior Court, pursuant to G. L. c. 211, § 4A.

A judge of the Superior Court entered a pretrial order, pursuant to Mass. R. Civ. P. 16, 365 Mass. 762 (1974),

directing the parties to review the extensive documents and other evidence to be offered in the case and to prepare a statement of both agreed and controverted facts. Compliance with the judge's order revealed a factual dispute in only three areas: (1) whether Westover actually received the benefit of the funds loaned by the plaintiffs; (2) whether Westover is insolvent, and if so, whether such insolvency is causally related to the allegedly illegal loans; and (3) whether all the loans, including the renewals or extensions of said loans, were approved by the Commissioner. The parties also disagreed as to the materiality of these facts and, on June 27, 1977, filed cross motions for summary judgment.

In his memorandum of decision and orders on the motions for summary judgment, the judge found no genuine issue of material fact and that the plaintiffs were entitled to judgment as matter of law. Pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), final judgment was entered. Accompanying that final judgment were the following rulings: (1) that the Application and Participation Agreement executed by Westover was valid and enforceable; (2) that Westover owed the various lending credit unions $2,400,000 plus interest from the default dates of the loans due each credit union; (3) that First Wisconsin be paid costs, as well as attorneys' fees and expenses in the amount of $215,000, plus any reasonable attorneys' fees and legal expenses incurred thereafter in collection efforts; and (4) that First Wisconsin held a valid and enforceable security interest in all of Westover's property and that the lending credit unions' rights in Westover's assets were superior to the claims of Westover's shareholders and unsecured creditors. Additionally, the judge ordered that Westover and Share Insurance specifically perform the security agreement and issued injunctive relief consistent with that order.

Westover and Share Insurance argue on appeal that the judge erred in making the following rulings: (1) that violations of G. L. c. 171, § 16, are insufficient as matter

376 Mass. 845                                                    851

Valley Stream Teachers Federal Credit Union *v.* Commissioner of Banks.

of law to render contractual obligations voidable or to bar restitution; (2) that evidence of diversion and misappropriation of loan proceeds by Westover's directors and/or officers, evidence of Westover's insolvency and evidence of plaintiffs' wrongful conduct was immaterial; (3) that the loan transactions in issue do not constitute a sale of securities under G. L. c. 110A; (4) that First Wisconsin has a valid and enforceable security interest in the assets of Westover; and (5) that the plaintiffs' rights to repayment are superior to any and all claims of Westover's shareholders in the event of Westover's liquidation. The defendants additionally argue that the judge erred in (1) awarding interest after November 26, 1975, the date of Share Insurance's appointment, costs and attorneys' fees; (2) granting injunctive relief which purportedly interferes with Share Insurance's performance of its statutory duties; and (3) allowing the plaintiffs' motions for severance and advancement of the case for a speedy trial. We disagree with all of the defendants' arguments. Our reasons are set forth in the remainder of this opinion.

1. Defendants' Liability on the Loan Obligations.

A. *Illegality and ultra vires.* General Laws c. 171, § 16 provides in pertinent part: "The board of directors [of a Masachusetts credit union], with the approval of the commissioner, may borrow money for and in behalf of the credit union." The defendants contend that Westover's illegal failure to obtain the Commissioner's approval for all but one of its borrowings[4] and the directors' approval or ratification of certain of the loans[5] renders Westover's contractual obligations void per se and bars the plaintiffs from obtaining restitutionary relief.

---

[4] As noted earlier, the parties disagree as to whether the Commissioner actually approved all of the Westover loans. It is undisputed that there exists written approval for one borrowing of $500,000 for a period of ninety days. For purposes of ruling on the summary judgment motions, the judge assumed that no other approval was obtained.

[5] The defendants maintain that the dollar amount of borrowings not approved or ratified by the board of directors was $1,100,000.

Chapter 171 affords specific remedies for its violation. See G. L. c. 171, § 3. The statute is silent as to whether such violations should affect the validity of the borrowing transaction entered into by the offending credit union. This court has consistently stated its unwillingness to assume, in the absence of a specific legislative mandate, that the Legislature intended to effect a forfeiture of private contractual rights. See *Shepard* v. *Finance Assocs. of Auburn, Inc.*, 366 Mass. 182, 188 (1974); *Broussard* v. *Melong*, 322 Mass. 560 (1948); *Barriere* v. *DePatie*, 219 Mass. 33 (1914).

In *Shepard* v. *Finance Assocs. of Auburn, Inc.*, *supra*, the plaintiff brought a bill in equity to rescind certain notes and mortgages on the ground that the defendant was conducting a "banking business" in violation of G. L. c. 167. Like c. 171, c. 167 does not provide for forfeiture of private contractual rights,[6] and we declined to read the statute in such a manner as to afford the plaintiff relief. We are not persuaded by the defendants' attempt to distinguish *Shepard* and see no reason to deviate from its ruling now.

However, the defendants maintain that even if their defense of illegality fails under *Shepard*, it should prevail under *Town Planning & Eng'r Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737 (1976), a more recent case. In *Town Planning*, we listed the following considerations as relevant in determining whether a sanction, beyond that prescribed by statute, should obtain: the nature of the subject matter of the contract; the extent of the illegal behavior; whether the behavior was a material part of the performance of the contract; the extent of the public policy underlying the prohibition; whether that policy would be defeated by denial of the added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff; and how gross or undeserved would be the defend-

---

[6] In fact, c. 171, § 3, makes the remedies for violations of c. 171 the same as those for violations of c. 167.

376 Mass. 845                              853

Valley Stream Teachers Federal Credit Union *v.* Commissioner of Banks.

ants' windfall. *Id.* at 745-746. As in *Town Planning,* we
think it obvious that the "vector of considerations" here
points in the plaintiffs' favor.

The defendants contend that the alleged illegal misap-
propriation of some of the loan proceeds after they
reached Westover[7] raises a genuine issue of material fact
under *Town Planning,* and argue that the judge's ruling
to the contrary and entry of summary judgment for the
plaintiffs "ignored the great harm to the public occa-
sioned by the defalcation of banking institutions." We see
no merit in the defendant's contentions.

This court has consistently held that lenders have no
duty to trace funds after the borrower has received them;
nor do lenders bear an responsibility for the uses to which
such funds are subsequently put. See, e.g., *Gill Equip. Co.*
v. *Freedman,* 339 Mass. 303, 308-309 (1959); *L'Herbette* v.
*Pittsfield Nat'l Bank,* 162 Mass. 137, 141 (1894). More-
over, we fail to see any connection between protecting the
public interest in preventing defalcations and punishing
good faith lenders. The defendants admit that the alleged
fraudulent scheme inolved only certain of Westover's in-
siders. There is no evidence that any of the plaintiffs
acted in concert with those insiders or anticipated that
the funds loaned would not be used for the corporation's
benefit. In such circumstances, the alleged misconduct is
irrelevant to the validity of a contractual claim and does
not preclude an award of summary judgment.

The defendants also contend that First Wisconsin and
ICU engaged in certain misconduct material, under *Town
Planning,* in deciding how serious or deserved would be
the forfeiture suffered by the plaintiffs. The evidence
proffered falls into three categories: first, that the loans

---

[7] In his "Memorandum of Decision and Orders on Plaintiffs' and
Defendants' Motions for Summary Judgment," the judge noted that
"[t]here was no proffer by the defendants as to the dollar amount of
any such diversion or misappropriation. The plaintiffs suggest . . . that
less than $150,000 was alleged to have been misappropriated or
fraudulently loaned."

made by the federally-chartered plaintiff credit unions violated 12 C.F.R. § 701.9 (1978), in that (1) the terms of at least four of the loans exceeded one year,[8] and (2) Westover failed to furnish current financial and statistical reports, and certain borrowing resolutions executed by its board of directors;[9] second, that First Wisconsin and ICU were negligent in negotiating loans to Westover in such large amounts; and third, that First Wisconsin and ICU misrepresented Westover's financial condition to the lending credit unions, thereby inducing them to make unwise loans, and made misrepresentations to Share Insurance which "induced" it to make interest payments on loans as they became due.[10] We fail to see the materiality of any of the above allegations.

Our purpose in directing courts faced with *Town Planning* situations to consider "how serious or deserved would be the forfeiture suffered," 369 Mass. 737, 745 (1976), was to ensure that any decision reached under the *Town Planning* test would be consistent with long established principles of equity and justice. The defendants appear to have misunderstood our intentions in this regard. Even assuming that the defendants could prove the

---

[8] Our understanding of the record is that, although Westover had loans outstanding for more than one year, each of those loans was supposed initially to last only for a period of ninety days. We think it highly unlikely that 12 C.F.R. § 701.9 (1978) was intended to proscribe renewals or extensions of loans when the lending institution's alternative would be to pursue its legal remedies for default. Thus, we are not convinced that the conduct alluded to by the defendants constitutes a violation of the Federal regulation. However, our disposition of the defendants' argument is not dependent on that fact.

[9] This defense is inapplicable to the $800,000 loaned by State-chartered credit unions.

[10] We note that no new loans were made after Share Insurance assumed control of Westover and that the loans made before Share Insurance's appointment were undisputed. We are therefore less than sympathetic to the defendants' contention that Share Insurance was deceived into making interest payments on behalf of Westover. The payments were requested when due and Westover was apparently obligated to make them.

376 Mass. 845                                    855

Valley Stream Teachers Federal Credit Union *v.* Commissioner of Banks.

misconduct alleged, such proof would tip the balance in the defendants' favor. The loans involved were not themselves illegal. The public policy underlying the prohibitions violated would not necessarily be served by the imposition of an added sanction. None of the misconduct described would mitigate the enormity or undeservedness of the windfall that a forfeiture would bestow upon the defendants. Moreover, much of the alleged misconduct relates exclusively to First Wisconsin and ICU, both of which are parties to this action only because of the security agreement involved. In focusing our attention in the direction of those parties, the defendants appear to have overlooked the fact that Westover's debt obligations run directly to the lending credit unions. Given all the circumstances listed above, we must agree with the judge that the plaintiffs' misconduct is so minor in comparison to that of the defendants as to be immaterial on a motion for summary judgment.

The defendants' contention that Westover's contractual obligations may be avoided under the doctrine of ultra vires[11] is equally fallacious. We note at the outset that the board of directors prospectively authorized borrowings under the Program before any loans were made. Moreover, Westover's board of directors vested its treasurer with at least apparent authority to borrow by adopting and executing the Application and Participation Agreement. In such circumstances, the defense of ultra vires is not available unless the abuse of corporate authority is known to the party dealing with the corporation. See *Wiley & Foss, Inc.* v. *Saxony Theatres, Inc.*, 335 Mass. 257 (1957). The defendants do not maintain that any of the plaintiffs had such actual knowledge.

---

[11] The ultra vires defense is relevant only to the plaintiffs' claims on the contract, given the general rule that ultra vires is not a legally sufficient defense to a claim for money had and received. See, e.g., *Morville* v. *American Tract Soc'y*, 123 Mass. 129, 138 (1877).

However, there exists an even more obvious reason why the defendants cannot prevail on their argument. It is well settled in the Commonwealth that a defendant in a contract action cannot use an ultra vires defense when the defendant has received the benefit of the bargain. See *W. W. Britton Inc.* v. *S.M. Hill Co.*, 327 Mass. 335 (1951); *Dome Realty Co.* v. *Gould*, 285 Mass. 294 (1934); *McLean Co.* v. *Sidebottom*, 277 Mass. 158 (1931); *New York Bank Note Co.* v. *Kidder Press Mfg. Co.*, 192 Mass. 391, 404 (1906); *Slater Woollen Co.* v. *Lamb*, 143 Mass. 420 (1887). Citing the alleged misappropriation of the loans to the personal use of several Westover insiders, the defendants challenge the legal conclusion that the transfer of funds onto the books and into the accounts of Westover constituted receipt of the funds. However, misappropriation of the funds after they have been so transferred will not invalidate the legal conclusion that Westover received the benefit of its bargain. Westover's remedy, if any, for the illegal misappropriation would be to bring an action agains the guilty officers or directors.

The defendants concede that the defense of ultra vires has lost most of its significance as a matter of private corporate law. They argue nonetheless that the general rule should not apply to banks, particularly to insolvent banks, and that Westover's alleged insolvency thus raises a genuine issue of material fact. We disagree.

The judge below did not, as the defendants suggest, conclude that the existence of deposit insurance makes ultra vires banking transactions enforceable regardless of the insolvency of the bank. Rather, the judge ruled that a credit union's potential insolvency does not render void otherwise enforceable transactions. The defendants presented the judge below with a line of older cases which, they argued, evidence an overriding public policy in favor of protecting depositors of banking institutions "regardless of the rights of the contracting parties." It was in response to this that the judge expressed his "reservations . . . as to the vitality of such a doctrine in the wake

376 Mass. 845                                      857

Valley Stream Teachers Federal Credit Union v. Commissioner of Banks.

of ... almost universal depositor's insurance." Having reviewed the cases cited by the defendants, we are of the opinion that they are not only dated, but devoid of support for the defendants' proposition. Those cases dealt with contracts which could be voided on the ground that all of the parties voluntarily participated in the fraudulent scheme. In such circumstances, it is the voluntary participation that is the controlling factor and not the financial condition of the bank.

Moreover, although we recognize that the public has a special interest in ensuring the stability of financial institutions, we are of the opinion that the regulatory scheme established by the Legislature provides sufficient enforcement mechanisms so as to make unnecessary the forfeiture of the rights of innocent third parties. We are also skeptical of the defendants' suggestion that implying such a forfeiture would actually serve the public interest. We think it just as likely that credit unions in this Commonwealth will suffer if we require potential lenders to guarantee, at peril of forfeiture, that the credit unions with which they are dealing are acting properly at all times. Finally, we note our agreement with the judge below that because both the plaintiffs and the defendants in this action are banking institutions, "there appears to be little logic in the mechanical application of a rule that would place the burden of ultimate loss on one group of depositors or shareholders in favor of the other."

B. *The transactions as sales of securities.* Perhaps the defendants' most creative theory is that the debt obligations involved are contracts for the sale of securities violative of G. L. c. 110A and void under § 410 (f) of that chapter. This court has not yet interpreted the term "security" as set out in G. L. c. 110A, § 401 (k). However, we are not at all persuaded that either the Program itself or the contracts involved fall within any acceptable usage of that term.

The definition of "security" in § 401 (k) is similiar to the definition in the Securities Act of 1933, 15 U.S.C. § 77B(1)

(1976). Thus, as a matter of statutory interpretation, decisions under the Federal act may be considered in construing § 401(*k*). This is the course that the judge below followed. In *United Hous. Foundation, Inc.* v. *Forman*, 421 U.S. 837 (1975), the Supreme Court stated "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . . In such cases the investor is 'attracted solely by the prospects of a return' on his investment." *Id.* at 852, quoting from *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 300 (1946).

We recognize that the Forman Court was dealing with that narrow subset of securities known as "investment contracts" and note that the defendants argue that the Program involved a sale of "loan participation interests" in the indebtedness of Westover as well. However, whether the sale of securities is alleged to be the sale of loan participation interests or the loans themselves, we hold that both lack the necessary investment aspect as matter of Massachusetts law. Although the loans may have presented a risk to the lenders, there was no funding of "risk capital" in the traditional sense. See *Great Western Bank & Trust* v. *Kotz*, 532 F.2d 1252, 1257 (9th Cir. 1976). Neither were there profits to be derived from capital appreciation or participation in earnings. We note that the parties spoke of payment of "interest" and not "dividends." Moreover, the transactions in issue lack other obvious characteristics of a security such as pledgeability, appreciability in value and concomitant voting rights.

In light of the above, we are compelled to conclude that the instant transactions did not constitute sales of or investments in securities but, rather, bona fide loans. Given that conclusion, we need not decide whether the plaintiffs' conduct violated G. L. c. 110A, or whether the

defendants would be privileged to plead such a violation as a bar to the plaintiffs' suit.

2. ENFORCEABILITY OF FIRST WISCONSIN'S SECURITY INTEREST.

The deed creating ICU Financial Trust provides First Wisconsin with a security interest in all of a borrowing credit union's assets. First Wisconsin holds this security interest for the benefit of all lenders and may enforce its right to the collateral in the event that a borrower defaults. The defendants do not deny the existence of this security agreement. However, they contend that it is unenforceable. The defendants premise this contention on two grounds: (1) the agreement is illegal and ultra vires; and (2) Share Insurance is a lien creditor whose interest takes priority over security interests that are unperfected.

We have discussed at some length the lack of effect that illegality and ultra vires will have on private contractual agreements absent some direction from the Legislature. The defendants now contend that, even if the loan agreements are enforceable as matter of law, the security agreement is not enforceable in equity as matter of public policy. We disagree. We are aware that there exists no Massachusetts statute empowering a credit union to pledge its assets as security for the loans that it obtains. However, there is no Massachusetts statute prohibiting such pledges, and we are not inclined to think them so extraordinary as to be beyond those powers which may be implied. Given that, and in light of the analysis underlying our resolution of the validity of the loan agreements themselves, we see no reason now to hold the security agreement unenforceable. The plaintiffs are no more culpable and their actions are no more illegal with respect to the security interest than with respect to the loans involved.

The defendants' argument that Share Insurance enjoys the status of a lien creditor under G. L. c. 106, § 9-301 (3),

is similarly unconvincing. The best that the defendants could do is argue by analogy. However, we fail to see the similarity between Share Insurance's status as an agent of the Commissioner and the statutory definition of a lien creditor under § 9-301(3). Thus, we need not decide whether, or to what extent, First Wisconsin's security interest remains unperfected. Nor need we decide whether, absent the security interest, the plaintiffs' right to repayment would take priority over the interests of Westover's shareholders in the event of a Westover liquidation. As secured creditors, the plaintiffs are entitled to be paid first.

The remainder of the arguments advanced on appeal are capable of being resolved in a few short paragraphs. We undertake to do so as follows.

The deed of trust obligated Westover to pay reasonable attorneys' fees and costs incurred by the lenders in the event of a default, plus interest at a specified rate on any unpaid balance after maturity. Moreover, the defendants not only failed to object to an award of interest, costs and attorneys' fees below, but actually proposed the amount of $215,000 as reasonable for the latter two items. In such circumstances, we will not disturb the judgment awarded.

Neither are we inclined to interfere with the granting of injunctive relief as a corollary to ordering specific performance of the security agreement. Fashioning such relief is within the inherent power of courts of general jurisdiction. *Nigro* v. *Conti*, 319 Mass. 480, 484 (1946). That Share Insurance is a statutory corporation acting with the approval or cooperation of the Commissioner does not lend it immunity from the ordinary powers of the courts.

Finally, because we conclude that the facts disputed by the parties are immaterial to the issues in the instant case, we reject the defendants' contention that the judge erred in ordering a severance and speedy trial. In fact, we think that the judge exercised his discretion properly in

this regard. The issues presented have a direct bearing on both the financial community in general and credit unions in particular. We thus appreciate the judge's effort to facilitate prompt resolution of this case.

*Judgment affirmed.*