**In re NEW COMMONWEALTH PUBLISHING COMPANY, INC., Debtor.**

**NEW COMMONWEALTH PUBLISHING COMPANY, INC. f/k/a Commonwealth Publishing Co., Plaintiff,**

v.

**BAYBANK MIDDLESEX, Defendant.**

**Bankruptcy No. 89–13164–JNG.
Adv. No. 89–1528.**

United States Bankruptcy Court,
D. Massachusetts (Boston).

Aug. 10, 1990.

Paula Bonnell, Boston, Mass., for plaintiff.

Louis DiFronzo, Riemer & Braunstein, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### I. INTRODUCTION

New Commonwealth Publishing Company, Inc. ("New Commonwealth" or the "Debtor") commenced the above-captioned adversary proceeding against BayBank Middlesex ("BayBank" or the "Bank") on November 3, 1989. The Debtor filed an amended complaint on February 28, 1990. That complaint is presently the subject of cross-motions for summary judgment.

### II. FACTS

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on October 19, 1989. The filing took place approximately six months after New Commonwealth acquired the assets and liabilities of Commonwealth Publishing Company, Inc. ("Old Commonwealth"). The structure of the transaction involved the assumption by New Commonwealth of Old Commonwealth's obligations under a $300,-000 note in favor of BayBank[1] and an industrial revenue bond with a balance of approximately $350,000.[2] New Commonwealth also engaged Old Commonwealth and its principals, John W. Powers, president, and Richard M. Weiner, treasurer, under a consulting agreement which called for payments in excess of $946,000 for the consulting services to be provided.[3] In addition, Old Commonwealth, Powers and Weiner each made a $100,000 payment (or executed a note) to BayBank in connection with the transaction, thereby reducing the total obligation to BayBank by $300,000 and eliminating their liability as guarantors.

The various undertakings of the parties to the April 12, 1989 transaction, including the granting of security interests by New Commonwealth in the assets it was acquiring, were memorialized in a closing binder that was available to those present at the closing, including David R.A. Steadman, Vincent J. McGugan and Boyette Edwards. Except for an opinion letter dated April 12, 1989 prepared by Robert W. Chmielinski as counsel to New Commonwealth and the affidavits and deposition testimony relied upon by the parties in support of their motions for summary judgment, all the relevant documents pertaining to the instant dispute between the Debtor and BayBank are contained in the so-called "closing bible." These documents reveal the following facts.

---

**1.** The assumption of the note between BayBank and Old Commonwealth on April 12, 1989 was cast as an "Assumption of Loan and Modification and Restatement of Master Note." The Master Note was dated May 30, 1984. Pursuant to the assumption agreement, the principal amount of the Master Note was reduced to $300,000.

**2.** On or about November 30, 1984, Old Commonwealth borrowed the proceeds of an industrial revenue bond issued by the City of Boston. BayBank acted as trustee under the 1984 loan agreement. As of April 12, 1989, New Commonwealth acknowledged that $345,542.25 was due in principal and $4,214.93 was due in interest.

**3.** Under the consulting agreement dated April 13, 1989, New Commonwealth agreed to pay Old Commonwealth $100,000 in 10 installments. It also agreed to pay $100,000 per year for five years commencing on September 30, 1990; $106,000 in payments of $5,300 per month beginning June 30, 1989; and $240,000 payable at the rate of $48,000 per year beginning in 1991.

New Commonwealth was established on or about April 10, 1989. The initial shareholders of the corporation were David R.A. Steadman ("Steadman") and Vincent J. McGugan ("McGugan"). The Articles of Organization that were filed with the Commonwealth of Massachusetts show that Steadman and McGugan were the directors and that initially Steadman was president and McGugan was both treasurer and clerk. The Articles include a provision that states:

> All corporate powers of the Corporation shall be exercised by the Board of Directors except as otherwise provided by law. In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, amend or repeal the By-Laws of the Corporation in whole or in part, except with respect to any provision thereof which by law of the By-Laws requires action by the stockholders, and subject to the power of the stockholders to amend or repeal any By-Law adopted by the Board of Directors.

The By-Laws of New Commonwealth provide in relevant part that the chairman, president, treasurer and clerk shall be elected by the directors and that no officer need be a stockholder or a director. The By-Laws further provide:

> [t]he President shall be the chief operating officer of the corporation and shall, subject to the direction and control of the directors, have general charge and supervision of the business of the corporation ... He shall have such other powers and duties as are usually incident to his office and as may be vested in him by these By-Laws or from time to time designated by the directors.

The initial meeting of the shareholders and directors of New Commonwealth took place on April 11, 1989. On that date the two directors voted to issue themselves 50 shares each of the common stock of New Commonwealth. At the initial meeting, Steadman and McGugan elected Boyette Edwards ("Edwards") as the president and clerk of the corporation. Steadman was elected chairman and McGugan was elected treasurer. Steadman and McGugan also voted to draft and implement a "Stock Appreciation Rights Plan" to be administered by the directors. The minutes provide that "[t]he initial participants in said Plan shall be Boyette Edwards, who will enjoy such participation as is described in a Shareholders' Agreement of this date...." The minutes of the initial meeting also reveal that McGugan and Steadman voted to authorized *inter alia* the assumption of "the principal balance of an Industrial Revenue Bond;" the entry into "an agreement to purchase the assets and certain liabilities from, and to pay consulting compensation to, the Commonwealth Publishing Company, Inc., under an Assumption of Liabilities and Purchase of Assets Agreement of this date;" and the execution of "such other documents and agreements as are required to consummate and perform on said Agreement."

The Shareholders Agreement referenced in the minutes, which is dated April 12, 1989, was executed by Steadman, McGugan and Edwards. It indicates that it was drafted in contemplation of the acquisition of Old Commonwealth and with the intention of effectively controlling management of New Commonwealth and avoiding "the divisive results of outsiders acquiring stock who may not prove compatible with the remaining shareholders." The Stockholders Agreement provides in relevant part:

> Each of the parties so long as he remains a stockholder will vote his respective shares in the Company for each of the following as director so long as said director-designee shall remain a stockholder in the Company: David Steadman, Boyette Edwards, and Vincent McGugan. Each agrees to resign as director when he ceases to be a stockholder.
>
> \*     \*     \*     \*     \*     \*
>
> The parties will have the following appointed and elected officers of the Company so long as the officer-designee remains a stockholder and proves faithful and competent:
>
> David Steadman as Chairman
> Boyette Edwards as President and Clerk

Vincent McGugan as Treasurer

Any of the above-mentioned officers who ceases to be a stockholder shall simultaneously with the surrender and transfer of his shares submit to the Company his resignation in writing as an officer.

In view of the provisions in the Articles and in the By–Laws previously quoted, the Stockholders Agreement appears to nullify the provision in the By–Laws permitting a non-shareholder to be an officer.

On April 12, 1989, New Commonwealth through its directors and shareholders, Steadman and McGugan, acquired Old Commonwealth. The "Assumption of Liabilities and Purchase of Assets Agreement" was signed by Steadman and McGugan and witnessed by Boyette Edwards. It recited a consideration of $1. The Bill of Sale was executed by Edwards as president. Two schedules attached to the Bill of Sale identified the assets purchased as well as the liabilities assumed. The Schedule of Assets was supported by a nine-page listing of assets with a value ascribed to each asset. Both the "supplemental inventory and value line listing" and the "equipment list of each department" appearing on page one and two are dated as of June 1, 1988. With respect to the machinery and equipment identified on subsequent pages, the values ascribed are not identified as book value, appraised value, fair market value, orderly liquidation value or forced sale value. Additionally it is unclear to what extent certain items of machinery and equipment were subject to security interests, although various notations suggest that to be the case, particularly with respect to the more expensive items. Moreover, the date the lists were prepared is not given. Nevertheless, if the Court were to accept the values stated, the total value of the assets listed is approximately $2.15 million.

The schedule of liabilities clearly identifies the assumption of the BayBank demand loan to the extent of $300,000 and the industrial revenue bond loan. Edwards and McGugan signed the Assumption of Loan and Modification and Restatement of Master Note, as well as the industrial revenue bond Assumption Agreement. In conjunction with the assumption of these obligations they also executed two pre-printed security agreements in favor of BayBank for inventory, accounts, equipment and other property.

Two affidavits and a deposition round out the factual picture. The affidavit of Robert W. Chmielinski ("Chmielinski") incorporates the Stock Appreciation Rights Plan referenced in the April 11, 1989 minutes and his opinion letter dated April 12, 1989, in which he opined that Boyette Edwards was the duly elected and acting president of New Commonwealth and that Edwards was duly authorized to execute the documents required by BayBank. Additionally, Chmielinski stated that after the loan transaction that he was not advised that Edwards was neither the president nor duly authorized to act on behalf of New Commonwealth.

The affidavit of Andrew J. Mahoney, a BayBank vice-president responsible for the New Commonwealth account, reveals that 1) BayBank believed that "the value of the assets exceeded the amount of the obligations being assumed and, more particularly, that the value of the assets exceeded the amount of Old Commonwealth's obligations to BayBank even before the partial reduction thereof;" 2) neither Boyette Edwards nor any other person employed by or acting on behalf of New Commonwealth ever indicated to BayBank that Edwards was anything other than president of New Commonwealth and duly authorized to act on its behalf; and 3) it was unnecessary for BayBank to engage in extensive due diligence because the April 12, 1989 transaction was just the extension of an existing lending relationship and additional capital was being invested in New Commonwealth by the purchasers.

During his deposition, Mahoney demonstrated an almost complete inability to recollect the financial condition of Old Commonwealth prior to the loan transaction. However, his testimony does suggest that BayBank may have suspected that Old Commonwealth was experiencing some financial difficulties.

## III. DISCUSSION

As BayBank correctly notes in its memorandum, the Debtor, through its amended complaint, challenges BayBank's security interest in the Debtor's assets on four separate theories:

Count I—that the Security Agreement giving rise to BayBank's security interest was not properly executed because the Debtor's president, Boyette Edwards, did not have corporate authority to bind the Debtor (the "Corporate Authority Theory");

Count II—that the credit extended by BayBank to the Debtor in exchange for a security interest in substantially all of the Debtor's assets was for less than reasonable equivalent value than the security interest granted by the Debtor to BayBank, and thus the Debtor should be entitled to avoid BayBank's security interest for the benefit of all the creditors (the "Fraudulent Conveyance Theory");

Count III—that BayBank and the Debtor were mutually mistaken as to the value of the assets purchased and/or the extent of liabilities assumed by the Debtor from its predecessor corporation, and thus the security interest is invalid due to mutual mistake (the "Mutual Mistake Theory"); and

Count IV—that BayBank obtained a security interest in the Debtor's assets that was broader than necessary thereby preventing the Debtor from obtaining necessary supplemental credit elsewhere (the "Equitable Subordination Theory").

BayBank vigorously opposes the positions asserted by New Commonwealth. Both parties agree, however, that there are no facts in dispute. Accordingly, if the Court agrees that there are, indeed, no material facts in dispute, pursuant to Fed.R.Civ.P. 56 made applicable to this proceeding by Bankruptcy Rule 7056, it may enter summary judgment.

### A. Lack Of Authority (Count I)

New Commonwealth argues that Boyette Edwards lacked actual authority to act on its behalf because of the provisions of the Shareholder Agreement. It cites *Kagan v. Levenson*, 334 Mass. 100, 134 N.E.2d 415 (1956), for the proposition that "[i]t is not within the implied powers of an officer of a business corporation to execute and deliver a mortgage of a substantial portion of its property." *Id.* at 105, 134 N.E.2d 415. *See also Frederick v. Letteney*, 214 Mass. 46, 101 N.E. 59 (1913); *England v. Dearborn*, 141 Mass. 590, 6 N.E. 837 (1886). In *England*, the court stated:

Authority to make a mortgage need not be given by formal vote, and may be inferred from the manner in which the business is conducted, with the knowledge and acquiescence of the corporation or its officers; *Sherman v. Fitch*, 98 Mass. 59; but there is nothing in this case from which previous authority or subsequent ratification can be inferred, except the fact that William H. England was made president, treasurer and general manager of the corporation.

141 Mass. at 592, 6 N.E. 837.

BayBank counters the Debtor's argument with the proposition that even if Edwards lacked actual authority because of the conflict created by the provisions of the corporate charter, the Stockholder Agreement and the By–Laws, Edwards was vested with apparent authority to bind New Commonwealth. It cites *Anglim v. Sears–Roebuck Shoe Factories*, 255 Mass. 334, 151 N.E. 313 (1926), and Chmielinski's affidavit in support of the position that apparent authority may be based upon a representation to a third-party that an officer has the authority to act, coupled with reliance on the part of the third-party. *See also Friend Lumber Co. v. Armstrong Building Finishing Co.*, 276 Mass. 361, 177 N.E. 794 (1931). In the *Friend* case, the Supreme Judicial Court specifically affirmed the following charge to the jury regarding ostensible or apparent authority:

If an officer of a corporation, if Mr. Sandler, for instance, in this case, had by his acts and conduct, known to the other two directors, bought materials from time to time, and those actions and conduct were known to the other directors, and they sat by and did nothing and let him continue his course, and his conduct

in regard to buying is such as to lead a reasonable man to believe that he had authority, which the others allowed him to exercise, he would have authority to bind the corporation in spite of the by-laws to the contrary. In other words, the limitation of the by-laws isn't necessarily binding on the question of authority. Now that is the law with reference to authorized agents and agents who are authorized to bind a corporation.

276 Mass. at 365, 177 N.E. 794.

BayBank also argues that New Commonwealth ratified the loan arrangement through the presence of its directors at the closing; by making payments pursuant to the note and bond; and by failing to renounce the transaction. Interestingly, it relies upon *Kagan v. Levenson,* 334 Mass. 100, 134 N.E.2d 415 (1956), the same case cited by the Debtor. In *Kagan,* the court stated:

> [i]t is true that the authority to execute the mortgage deed need not be established by a formal vote of the company. The execution of the mortgage by its president and treasurer 'with the knowledge and concurrence of the directors, or with their subsequent and long continued acquiescence, may properly be regarded as the act of the corporation.' But nothing less than that would suffice.

334 Mass. at 105, 134 N.E.2d 415 (citation omitted).

BayBank also argues that New Commonwealth is estopped from relying upon lack of corporate authority since it received the benefit of its bargain in the loan transaction. BayBank cites *Valley Stream Teachers Federal Credit Union v. Commissioner of Banks,* 376 Mass. 845, 384 N.E.2d 200 (1978), for the proposition that "a defendant in a contract action cannot use an ultra vires defense when the defendant has received the benefit of the bargain." 376 Mass. at 856, 384 N.E.2d 200.

The Court is compelled to find that although Edwards may technically have lacked actual authority to bind New Commonwealth, the totality of the circumstances warrant rulings that Edwards was blanketed with apparent authority, that New Commonwealth ratified the loan transaction and that New Commonwealth is estopped from using the lack of actual authority or an ultra vires theory as a weapon (as opposed to a defensive shield) to set aside BayBank's security interest. In the first place, it is difficult for the Court to conclude that BayBank was totally remiss in failing to scrupulously examine the Stockholder Agreement and all other relevant documents in view of Chmielinski's opinion letter and the actions of Steadman and McGugan. Additionally, the ramifications of the Stockholder Agreement were not such that "a reasonable man" would believe that Edwards lacked corporate authority, in light of the affirmative actions of Steadman and McGugan in cloaking him with apparent authority at the time of the closing. *See Friend Lumber Co. v. Armstrong Building Finish Co.,* 276 Mass. at 365, 177 N.E. 794.

Moreover, the Court is persuaded that the doctrines of ratification and estoppel apply. Consistent with the language quoted in *Kagan v. Levenson,* 334 Mass. at 105, 134 N.E.2d 415, it is undisputed that Edwards signed the loan papers with the knowledge and concurrence of Steadman and McGugan who had previously voted to authorize the purchase of Old Commonwealth and the concomitant borrowing and execution of loan documents. Additionally, these gentlemen failed to renounce the transaction within a reasonable time of its completion.

Finally, the Court is mindful of the dicta in *Valley Stream Teachers Credit Union v. Commissioner of Banks,* 376 Mass. 845, 384 N.E.2d 200 (1978), wherein the court noted that the defense of ultra vires has lost most of its significance as a matter of private corporate law. *Id.* at 856, 384 N.E.2d 200. Here, the ultra vires doctrine is not even being used as a defense but as a weapon to void BayBank's security interest. In view of the circumstances of the case, the Court finds any misfeasance on the part of the Bank in failing to detect Edwards' lack of actual authority does not warrant a penalty that would grant the Debtor a windfall, particularly where the

conduct of Steadman and McGugan appears to the Court to have precipitated the problem in the first instance. Thus, New Commonwealth is estopped from relying upon the lack of actual authority.

### B. Mutual Mistake (Count III)

■ New Commonwealth argues that the lack of material information or the factually mistaken assumption that the debt assumed was manageable makes the security interest granted to BayBank void for mutual mistake. BayBank, based upon Mahoney's affidavit, asserts that there was no mutual mistake, noting that it understood the loan agreement to provide it with a security interest in substantially all the Debtor's assets to secure the indebtedness in question. Likewise, it notes that New Commonwealth proceeded with the April 12, 1989 transaction on the same assumption as evidenced by the Debtor's schedules which indicated that BayBank has a security interest in assets whose listed value far exceeds the amount of the obligations owed by the Debtor to the Bank. Therefore, BayBank asserts that there was no mutual mistake as to a matter going to the essence of the agreement, *see Corbett v. Craven,* 196 Mass. 319, 82 N.E. 37 (1907), and that the security interest cannot be set aside since it understood the agreement to be substantially as written. *See Id.* at 321, 82 N.E. 37 ("The kind of mistake which is a foundation for equitable relief is a mutual mistake of the parties, not a mistake of one of them."); *Eno v. Prime,* 317 Mass. 646, 650, 59 N.E.2d 284 (1945) (" 'If one of the parties understood the agreement to be substantially as written, the other party will not be entitled to relief on the ground of mistake.' ").

In *LaFleur v. C.C. Pierce Co.,* 398 Mass. 254, 496 N.E.2d 827 (1986), the Supreme Judicial Court stated:

> The legal principles underlying the doctrine of mutual mistake are well established. Where there has been a mistake between the parties as to the subject matter of a contract, there has been no "meeting of the minds," and the contract is voidable at the election of the party adversely affected. *Jeselsohn v. Park Trust Co.,* 241 Mass. 388, 392 [135 N.E. 315] (1922). 13 S. Williston, Contracts § 1535 (1970). The mistake must be shared by both parties, and must relate to an essential element of the agreement. *Century Plastic Corp. v. Tupper Corp.,* 333 Mass. 531, 534 [131 N.E.2d 740] (1956). *Cavanagh v. Tyson, Weare & Marshall Co.,* 227 Mass. 437, 444 [116 N.E. 818] (1917). See generally Restatement (Second) of Contracts § 152 (1975). The mistake must involve a fact capable of ascertainment at the time the contract was entered into, and not a mere expectation or opinion about future events. *Cook v. Kelley,* 352 Mass. 628, 632 [227 N.E.2d 330] (1967). *Aldrich v. Travelers Ins. Co.,* 317 Mass. 86, 88 [56 N.E.2d 888] (1944). A contract will not be rescinded for mutual mistake where one party was aware at the time the contract was signed that he had limited knowledge as to essential facts, but nonetheless assumed the risk that circumstances would prove to be other than as expected. *Aldrich, supra. Covich v. Chambers,* 8 Mass App.Ct. 740, 749 [397 N.E.2d 1115] (1979). *See Maloney v. Sargisson,* 18 Mass.App.Ct. 341, 346 [465 N.E.2d 296] (1984). See generally Restatement (Second) of Contracts § 156, comment a (1975).

*Id.* 398 Mass. at 257–58, 496 N.E.2d 827.

■ The Court is unable to conclude on the facts stated that New Commonwealth has established the existence of a mutual mistake. Moreover, to the extent a mutual mistake did exist, it should result in the avoidance of the entire agreement between New Commonwealth and BayBank, not the remedy sought by the Debtor—the setting aside of the Bank's security interest. The Court finds that, at best, both New Commonwealth and the Bank took the risk that debts assumed were manageable and that the values of assets securing the debt were equal to the values set forth on the attachments to the Bill of Sale.

### C. Fraudulent Conveyance (Count II)

■ Count II of the Debtor's amended complaint contains the following specific

allegations with respect to the alleged fraudulent conveyance:

35. The credit granted by the Bank in the April 1989 transactions in exchange for security interest(s) of the scope the Bank sought was less than a reasonably equivalent value in exchange for security interest(s) of such magnitude.

36. The security interest(s) granted to the Bank in the April 1989 transaction by the debtor corporation were fraudulent as to creditors because the security interest(s) was/were granted without a fair consideration to debtor corporation from the Bank.

37. The conveyance of security interest(s) to the Bank by debtor corporation when it was about to engage in the printing business rendered the remaining property after the grant of the security interest an unreasonably small capital for that business and was fraudulent as to debtor corporation's creditors and those who became debtor corporation's creditors during the continuance of such business.

38. The bond required quarterly payments of between $26,000 and $27,000 apiece.

39. The grant of security interests to the Bank without an extension of credit beyond the 180–day demand terms of the note and the quarterly repayment provisions of the bond was made when debtor corporation intended to incur or believe [sic] it would incur (and did incur) debts beyond its ability to pay.

40. Debtor corporation was insolvent on the date when it granted the security interest(s) to the Bank or became insolvent as a result of the grant of the security interest(s).

41. After the grant of the purported security interest(s) to the Bank, the property remaining with the debtor corporation was an unreasonably small capital for the business in which it was about to engage.

42. Debtor corporation is entitled to avoid for the benefit of all its creditors the security interest(s) granted to the Bank in the April 1989 transaction.

Notably, New Commonwealth fails to indicate whether it is proceeding under section 548 of the Bankruptcy Code 11 U.S.C. § 548 or the Uniform Fraudulent Conveyance Act Mass.Gen.Laws ch. 109A, §§ 1–13 (West 1990) ("UFCA"), in effect in Massachusetts and available to the Debtor pursuant to section 544(b) of the Bankruptcy Code. 11 U.S.C. § 544. Moreover, the Debtor fails to cite relevant sections of either section 548 or the UFCA.

Under section 548 of the Bankruptcy Code, the Debtor has the burden of proving the following elements: 1) "the transfer of an interest of the debtor in property" within one year of the filing; 2) the receipt of "less than a reasonably equivalent value for such transfer;" and 3) insolvency on the date of the transfer or as a result of the transfer. In lieu of proving insolvency, which is defined at 11 U.S.C. § 101(31), the Debtor could prevail upon a showing that it "was engaged in business ... or was about to engage in business ... for which any property remaining with the Debtor was an unreasonably small capital," or that it "intended to incur or believed that it would incur debts that would be beyond its ability to pay as they matured." 11 U.S.C. § 548(a)(2). The UFCA contains similar provisions. Although paragraph 36 refers to fair consideration which is defined at section 3 of ch. 109A, the Court presumes the Debtor is relying upon section 548 of the Bankruptcy Code because the transaction in question took place within one year of the bankruptcy filing, thus rendering reliance upon the UFCA's longer statute of limitations unnecessary. In any event, for purposes of deciding the cross-motions for summary judgment and in view of the meager facts relied upon by the parties with respect to Count II, the Court will not attempt to differentiate the statutes or relevant case law under them as any differences in the statutory language are not decisive.

New Commonwealth highlights certain undisputed facts in support of its claim that the conveyance of a security interest in substantially all it assets—"the transfer of interest of the debtor in property"—was

a fraudulent one. It emphasizes the amount of debt assumed by New Commonwealth, namely 1) the indebtedness of approximately $1 million to the former owners; 2) approximately $400,000 in trade debt which is set forth on Schedule J to the Assumption of Liabilities and Purchase of Assets Agreement; 3) $41,000 in tax debt; 4) $650,000 to BayBank; and 5) an unspecified sum to equipment lessors. With reference to the assumption agreement, the Debtor notes that the assets purchased are not identified and those identified on attachments to the Bill of Sale are given meaningless values. In argument counsel to New Commonwealth, relying on Mahoney's deposition, suggests that on April 12, 1989 New Commonwealth was instantaneously unable to pay its trade creditors, and, since the corporation couldn't keep up with existing debt, it would certainly be unable to keep up with its new debt of approximately $2.1 million. The Court can find no support for these unequivocal assertions. Moreover, the Court is unable to discern from its review of the portions of Mahoney's deposition that were supplied to it that the Bank believed that Old Commonwealth was in precarious financial shape.[4] Indeed Mahoney's affidavit states that:

> [a]t the time of this transaction, BayBank believed that the value of the assets exceeded the amount of the obligations being assumed and, more particularly, that the value of the assets exceeded the amount of Old Commonwealth's obligations to BayBank even before the partial reduction thereof. Thus, as a result of the assumption and partial reduction of the obligations to BayBank, New Commonwealth did obtain assets, the equity in which was increased by $300,000.00 by reason of the partial reduction of the obligation to BayBank.

At best the disparities between the views propounded in Mahoney's affidavit and his deposition create a genuine issue of material fact as to the Debtor's solvency.

Thus, the Court finds that the Debtor established only that there was a transfer of interest of the Debtor in property. In particular, the Court cannot conclude that that transfer was for less than a reasonably equivalent value, or that the Debtor was insolvent or rendered insolvent. By granting BayBank a security interest in substantially all its assets, New Commonwealth was able to obtain the Bank's acquiescence to its acquisition of all the assets of Old Commonwealth, including those that were subject to BayBank's lien. Moreover, subsequent to the transaction, the Debtor enjoyed the use of those assets. However, the Court has no reliable facts relative to the value of those assets or the value of Old Commonwealth as a going concern. This lack of material information makes it impossible for the Court to find that the transfer was for less than a reasonable equivalent value and of equal importance, that the Debtor was insolvent. However, the Court is not blind to the fact that New Commonwealth did not receive loan proceeds in exchange for the granting of security interests in its assets. Indeed, the loan proceeds were transferred to Old Commonwealth long before the transaction in question.

In *In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127 (Bankr.D.Mass.1989), the court discussed the concept of "less than a reasonably equivalent value." It noted that:

> Two things are clear from this language. The debtor must receive the required value, not some third party. *E.g., Klein v. Tabatchnick,* 418 F.Supp. 1368 (S.D.N.Y. 1976). And, unlike the doctrine of consideration in contract law, that value must pass a measurement test. In applying the test, we must examine all aspects of the transaction in order to measure carefully the value of all of its benefits and burdens to the debtor, direct or indirect. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir. 1981).

100 B.R. 136. In this case, it is clear that neither the Debtor nor the Bank made an attempt to measure values.

---

**4.** At one point Mahoney spoke of the Debtor getting "back on its feet" in terms of profitabili-ty. However, Mahoney couldn't recall whether the company was losing money.

In the Court's view, the April 12, 1989 transaction was merely a continuation of the status quo except in several very important respects: 1) the Debtor entered into consulting agreement with Old Commonwealth and its directors which increased the companies debt burden by approximately $1 million; 2) Powers and Weiner were released as guarantors of Old Commonwealth's debt in exchange for the reduction of New Commonwealth's debt to BayBank by $300,000; and 3) the Debtor assumed Old Commonwealth's liabilities to BayBank and granted it security interests in its assets. Obviously, Old Commonwealth and its directors received value in the transaction. However, without more concrete information about Old Commonwealth's financial condition prior to April 12th and New Commonwealth's financial condition thereafter, the Court is unable to properly evaluate the benefits and burdens imposed upon the Debtor so as to determine the value it received in the transaction. Certainly the Court cannot find that the bankruptcy filing six months after the transaction creates a presumption that the Debtor received less than a reasonably equivalent value for the security interests transferred or that the Debtor was rendered insolvent. Nevertheless, any indirect benefits to New Commonwealth, such as acquisition and use of the Bank's collateral, may have a measurable value. *See Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991–92 (2nd Cir.1981).[5] In *Rubin*, the Court of Appeals for the Second Circuit observed:

> If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been

preserved, and § 67(d) has been satisfied provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

*Id.* In vacating the district courts rulings and remanding the matter for further proceedings, the circuit court emphasized the need to "measure the economic benefit" to the debtor and to compare that benefit with the size of the security given in exchange. *Id.* at 993.

With respect to the Debtor's alternative assertions that it was left with unreasonably small capital and that the grants of security interests were made when the Debtor intended to incur (and did incur) debts beyond its ability to pay, the Court suffers from the same lack of information about the Debtor's financial health. In *Barrett v. Continental Illinois National Bank and Trust Company*, 882 F.2d 1 (1st Cir.1989), the Court of Appeals for the First Circuit considered an appeal from the dismissal, after a non-jury trial, of any action under § 5 of the UFCA.[6] The appellants in *Barrett* argued that the apparent insolvency of Eastern Capital Corporation, a corporation in which they had an interest, on the precise date of the transaction at issue, conclusively established that the transfer left the corporation with an unreasonably small capital. The appellants relied upon *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D. Pa.1983), *aff'd sub nom, United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). The circuit court stated:

> it thus appears that in *Gleneagles*, although it seemed to focus on the specific date of the transaction, the court actually took into account the corporation's

---

**5.** *Rubin* involved § 67(d) of the Bankruptcy Act of 1898 which incorporates the essential portions of the UFCA. *See* 4 Collier on Bankruptcy 9548.01[1] at p. 548–7 (15th ed. 1990).

**6.** Section 5 of the UFCA is similar to section 548(a)(2)(B)(ii) of the Bankruptcy Code. It provides:

> Every conveyance made without fair consideration when the person making it is engaged

or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Mass.Gen.Laws Ann. ch. 109A, § 5 (West 1990).

capital levels during a period extending in both directions from that date. We believe that the proper application of § 5 requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of a challenged transfer. The approach avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and allows the court to make a realistic assessment of the impact of a transfer on a company's ability to conduct its affairs.

882 F.2d at 4. *See also Matter of Atkinson*, 63 B.R. 266, 269 (Bankr.W.D.Wisc. 1986) (capital must be unreasonably small "relative to the nature of the venture") and *Widett v. George*, 336 Mass. 746, 751, 148 N.E.2d 172 (1958) (questions concerning the adequacy of capital after a challenged transfer must be "judged prospectively" from the date of the transfer).

In this case, the Court doesn't even have a balance sheet as of April 12, 1989, let alone solid evidence of the Debtor's financial condition in the months after the April 12, 1989 closing. Although the Court can easily infer from the bankruptcy filing itself that the Debtor failed to pay its creditors, the Court cannot find that the Debtor met its burden of proof on the issue of unreasonably small capital, since a variety of other factors unrelated to the April 12th transaction could have been involved to the Debtor's inability to pay creditors and its decision to file.

In summary, the Court finds that allowance of the Debtor's motion for summary judgment is unwarranted in light of the inconclusive record before it. However, allowance of the Bank's motion is equally unwarranted for the same reasons.

D. Equitable Subordination (Count IV)

New Commonwealth through Count IV of its complaint, seeks to equitably subordinate the Bank's debt because it failed to make·adequate inquiries about the April 12th transaction and took a security interest in the Debtor's assets that was broader than necessary to protect the amount of credit it extended, thereby damaging the Debtor's ability to obtain supplemental credit elsewhere. BayBank disputes this assertion, relying upon Mahoney's affidavit in which the Bank officer indicated that he monitored the relationship between Old Commonwealth and the Bank and was familiar with its capital structure. Moreover, BayBank emphasizes the fact that the $300,000 reduction in the corporate debt actually increased the Debtor's opportunities for obtaining supplemental credit.

The Fifth Circuit has established a three-prong test for determining equitable subordination claims: (1) whether the claimant engaged in inequitable conduct, (2) whether that conduct resulted in injury to other creditors, and (3) whether subordination would be consistent with other provisions of the Bankruptcy Code. *In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir.1983); *But cf In re Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.1990) (creditor misconduct is not a prerequisite for the application of equitable subordination to a creditor's claims under section 510(c)). Using this test the Court finds that there is, at present, an insufficient basis for equitable subordination pursuant to section 510 of the Bankruptcy Code. However, until the Court has had an opportunity to resolve the issues raised by Count II, it will not allow either the Debtor's or the Bank's motion for summary judgment with respect to Count IV.

## IV. CONCLUSION

In view of the foregoing, the memorandum and arguments of counsel, the Court hereby denies the Debtor's Motion for Summary Judgment in its entirety and allows the Bank's Motion for Summary Judgment with respect to Counts I and III of the Debtor's complaint. The Court denies BayBank's Motion for Summary Judgment with respect to Counts II and IV.