Fabricant, Judith, J.
INTRODUCTION
This action arises from an unpaid debt for goods sold by plaintiff Lanee Great Plastic Co., Ltd., to defendant The Handmade Bow Co., Inc. Lanee seeks to recover for Handmade’s debt, on various theories, from Dyno Decorative Bows, LLC (Dyno), Southern Group Custom Manufacturing, LLC (Southern), TG Capital Corporation, and Johnathan Robertson. Before the court are two separate motions for summary judgment, one filed jointly by Dyno, TG Capital, and Robertson, and another filed by Southern. For reasons that will be explained, the motions will be allowed in part and denied in part.
BACKGROUND
The record, considered in the light most favorable to the plaintiff, with all reasonable inferences in the plaintiffs favor, provides evidentiary support for the following facts. Until the summer of 2007, Handmade was in the business of making and selling bows. Its shareholders were George and Sandra Kean and Henry and Richard Gebel; its directors and officers were the Keans and their daughter.[2] Handmade had facilities in Massachusetts, Texas, and Mexico. The Mexico facility was operated by its subsidiary, Bows de Mexico.[3] In 2006, Handmade ordered goods from Lanee, the plaintiff here, for a price of $648,661.56. Lanee shipped the goods, without security, but Handmade did not pay, despite promises to do so. Lanee filed suit against Handmade in federal court on July 10, 2007, and obtained a default judgment in the amount of $720,360.21 on October 10, 2007. No one has paid the judgment.
Unbeknownst to Lanee, Handmade lacked funds to pay for the goods at the time it ordered them from Lanee. It expected to pay from profit on sales not yet completed, although other creditors already held liens on its inventory and accounts receivable. For approximately two years before it placed its order with Lanee, Handmade had been actively marketing its business for sale or investment, through a series of investment banking firms.
In early June 2007, Sovereign Securities introduced Handmade to Robertson, an agent of TG Capital. Robertson contacted Dyno, LLC, which was in the sewing and crafts products business.[4] Shortly thereafter, Dyno, LLC, formed defendant Dyno Decorative Bows, LLC, in Delaware. Dyno, LLC, was the sole member of Dyno. Its funding sources were Dyno, LLC, TG Capital, and CIT, an unrelated lender. On July 17, 2007, Southern Group Custom Manufacturing, LLC, was formed in Texas. Its original certificate of formation listed Carlos de Leon and George and Sandra Kean as managing members. An amendment dated August 17, 2006, signed by Carlos de Leon as sole member, deleted the Keans. Carlos de Leon was Handmade’s operations manager.
Between June and August 2, 2007, Robertson and representatives of Dyno, Southern, TG Capital, and Handmade negotiated. Robertson wrote a letter outlining proposed terms, which would include a supply agreement between Dyno and Southern. A meeting occurred at the office of Dyno, LLC, attended by Robertson, the Keans, Carlos de Leon, and representatives of Dyno. Information was circulated regarding Handmade’s assets and debts. An attorney for Handmade engaged a professional auctioneer and appraiser, Michael Saperstein of Paul E. Saperstein Co., Inc., to appraise Handmade’s inventory. Saperstein assessed its liquidation value—that is, the price it would bring at auction—as $206,000.[5]
On August 2,2007, Handmade executed an assignment for the benefit of creditors, transferring its assets to Henry Ellis as assignee. On the same date, Ellis sold substantially all of Handmade’s assets to Dyno and Southern. Handmade’s inventory (including whatever remained of the goods shipped by Lanee), and its intellectual properly, accounts receivable, customer lists, and certain other intangible assets, went to Dyno. Southern acquired the equity in Bows de Mexico, as well as machinery, equipment, and certain other assets.[6] Also on August 2, 2007, Dyno and Southern executed an exclusive supply agreement, under which Southern agreed to manufacture bows solely for Dyno’s use, and Dyno agreed to fund certain expenses of Southern, including the cost of raw materials, rent, and legal fees, subject to Dyno’s review of Southern’s budget and expenses. Attached to the supply agreement was a list of Handmade’s creditors as of August 2, 2007, including Lanee.
Dyno paid all costs of the Handmade transaction, including investment bankers’ fees, consultant services, attorneys fees, Saperstein’s appraisal fee, and the costs of formation of Dyno and Southern. Dyno also paid $267,091.06 to the creditor that had a lien on Handmade’s inventory; $44,147.09 to the creditor that had a lien on the accounts receivable; $75,000 to Ellis; and $100,000 to the Gebels, in return for their release of debts to them from Handmade and redemption of their 30% ownership. Dyno has also accepted responsibility to pay a total of $150,000 to Sovereign Securities and two other investment bankers in connection with the transaction. Southern, using funds supplied by Dyno, paid $25,000 to Ellis. In an e-mail to Robertson on August 23, 2007, George Kean commented that Saperstein and Handmade’s attorney “did *505 some very key work in getting the assets appraised easily and very low and expedited the process . . . This was very important to the deal.”
Following the transaction, Dyno, supplied by Southern, filled 90% of Handmade’s $3.8 million in outstanding purchase orders. In some cases, Dyno paid fines to Handmade’s former customers for late delivery. Dyno continues to do business with some of these customers. Dyno paid at least five independent contractor sales representatives (businesses or natural persons) the amounts of commissions they were owed by Handmade. Some of these sales representatives continue to work with Dyno. Dyno entered into agreements with George and Sandra Kean for consulting services. George never actually provided consulting services, but Sandra did, for a period of some weeks, training sales teams on product lines, designing future programs, and introducing Dyno to Lowe’s, Handmade’s former and now Dyno’s largest customer. Dyno also negotiated with Bows de Mexico’s Mexican creditors and funded Southern’s payment of certain claims, so as to retain the creditors as Southern’s suppliers. Some of these creditors continue to supply Southern.
Carlos de Leon is president and sole owner of Southern. Two other former employees of Handmade now hold management positions with Southern: Enrique de la Garza, Southern’s operations manager, and de Leon’s sister, who manages Southern’s sample making process.[7] Southern has continued Bows de Mexico’s operations and retained most of its personnel, and has continued to lease the warehouses formerly used by Handmade in Brownsville, Texas and Matamoros, Mexico.
By a letter dated August 15, 2007, Ellis notified Handmade’s unsecured creditors, including Lanee, that Handmade had “ceased operations due to a significant loss of sales,” that its assets had been liquidated at appraised value, and that he would be able to pay “approximately 1.2% to assenting unsecured creditors.” He requested that the recipients sign an enclosed assent form and return it to him by October 15, 2007. Lanee did not sign the assent and did not receive a distribution.
Lanee filed this action on November 30, 2007, and filed its First Amended Complaint on Januaiy 29, 2008. In a May 23, 2008, memorandum of decision and order on motions to dismiss filed by Ellis and Dyno, the Court dismissed all claims against Ellis, with prejudice, and dismissed the claims against Dyno without prejudice to the filing of an amended complaint limited to claims of fraudulent transfer and successor liability. Lanee filed its Second Amended Complaint on July 2, 2008.[8]
Eight claims remain in the present complaint. Against Handmade, Lanee alleges fraudulent conveyance (count I) and seeks a declaratoryjudgment to void the assignment for the benefit of creditors and sale of assets (count X).[9] Against Dyno and Southern, Lanee alleges fraudulent conveyance (counts II and III respectively) and successor liability (counts IV and V respectively). Lanee also alleges unjust enrichment against Southern (count VIII). [10] Finally, Lanee alleges tortious interference with an advantageous business relationship against TG Capital and Robertson (counts VI and VII respectively).
DISCUSSION
Summaiy judgment shall be granted where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating both the absence of a triable issue and that the summaiy judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summaiy judgment, but must offer evidence of specific facts sufficient to demonstrate the existence of a genuine dispute. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
1. Successor Liability (Counts IV and V).
The Court will address the claims of successor liability first, because these seem to reflect the plaintiffs core theoiy. Massachusetts follows the “traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets, unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor . . . The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors.” Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 556 (2008) (internal quotations and citations omitted).
“The concept of ‘de facto merger’ has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity.” Id. at 557. “By contrast, a ‘mere continuation’ has most often been found where the owners of the selling entity set up the buyer with the specific purpose of continuing their business under a new form.” Id. But the distinction between the two “seems more apparent than real,” *506 and courts often use the terms “de facto merger" and “mere continuation” interchangeably because, in practice, they “appear to refer to the same concept.” Id. at 556, n.15 (internal quotations and citations omitted). In considering these theories, the Court’s “focus is on whether one company has become another for the purpose of eliminating its corporate debt.” Id., 451 Mass. at 556.
“The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.” Id. at 557, quoting Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. 359-60 (1997). “No single factor is necessary or sufficient to establish a de facto merger.” Id. at 360.
Similarly, the mere continuation theory “envisions a reorganization transforming a single company from one corporate entity into another.” Milliken, 451 Mass. at 557. Massachusetts courts have described the essence of the mere continuation theory as the purchasing corporation being “merely a ‘new hat’ for the seller.” Milliken, 451 Mass. at 557-58. A finding of continuation typically requires “at a minimum; continuity of directors, officers, and stockholders, and the continued existence of only one corporation after the sale of assets.” Id. at 557, citing McCarthy v. Litton, 410 Mass. 15, 23 (1991). “Similar to the considerations underlying a finding of a ‘de facto merger,’ the factors characterizing a continuing corporation are traditional indicators, but no single factor is dispositive, and the facts of each case must be examined independently.” Id. at 558. The court should look through the successor company’s form to its substance and intent. Id. at 560.
Here, the evidence offered, considered in the light most favorable to Lanee, and with all reasonable inferences drawn in its favor, would support a finding that Dyno and Southern, in combination, have effectively continued the business of Handmade. Dyno and Southern are separate entities, with separate owners, but their relationship is sufficiently close that a juiy could fairly consider them together for this purpose. Their owners participated jointly in the negotiations leading to the separation of Handmade’s manufacturing and distribution operations into two entities. They then combined the functions of those two entities through their exclusive supply agreement. Dyno paid all costs of the transaction for both, and continues to fund Southern’s operations. Dyno also paid debts owed by Handmade (or its subsidiary, Bows de Mexico) to a number of suppliers of goods or services, so as to enable Southern to maintain relationships with those entities. On these facts, a jury could fairly consider Dyno and Southern as functionally one entity.
Viewing the two in that way, a jury could conclude that, in combination, Dyno and Southern have continued the business of Handmade, and that they structured the transaction with the intention to do so, while eliminating as much of its debt as possible. Dyno and Southern continued Handmade’s manufacturing and sales operations, using its pre-existing suppliers, production facilities and personnel, and selling to many of its pre-existing customers, including filling purchase orders that were outstanding at the time of the transaction. They paid those of its debts that they deemed necessary to preserve relationships essential to the business, but disclaimed others.
The new enterprise is not under the same ownership as the old. The Gebels never had any role, and although Southern’s original certificate of formation listed the Keans as managing members, an amendment filed within weeks removed them from that status. This factor weighs against successor liability, but does not necessarily preclude it. The record reflects some, although limited, overlap in management: Sandra Kean performed some consulting services, and Carlos de Leon, Southern’s sole owner and president, was a management employee of Handmade. Handmade, as far as the record discloses, has not formally dissolved, but it has liquidated its assets and ceased its ordinary business operations; it did so soon after the formation of Dyno and Southern, and contemporaneously with their acquisition of its assets and assumption of its business. Overall, in the Court’s view, the evidence, although not strong, is sufficient to establish a genuine issue of material fact as to whether Dyno and Southern, in combination, constitute, in substance, a continuation of Handmade.
The evidence also provides some, albeit limited, support for the theory that Dyno and Southern engaged in a fraudulent effort to avoid those of Handmade’s liabilities that they did not consider in their interest to assume. A jury could find, from the evidence, that, while intending to continue Handmade’s business essentially as it was, they arranged to structure the transaction as a purchase of assets at liquidation prices. Such prices would reflect fair value if Handmade’s business were closing, with each asset for sale separately to the highest bidder. But a jury could conclude that Handmade’s business was not closing, but was rather being transferred, *507 essentially intact, to the two new entities operating together. In that event, fair value for the transaction would have reflected the value of the business as a whole, as a going concern, which likely would have been higher than the sum of the liquidation value of individual assets.[11] Drawing all inferences in favor of Lanee, a jury could conclude that Dyno and Southern structured the transaction as they did so as to obtain the benefits of the on-going business, while avoiding its liabilities. See generally Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984) (courts generally disfavor summary judgment in instances where state of mind is at issue). The Court concludes that the evidence is sufficient to present a genuine dispute of material fact on Lanee’s claims of successor liability.
2. Fraudulent Conveyance (Counts II and III).
The Massachusetts Uniform Fraudulent Transfer Act provides that “a transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer is made... if the debtor made the transfer . .. without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . .” G.L.c. 109A, §6(a). The court should measure equivalent value from the predecessor’s perspective, examining all aspects of the transaction. See In re New Commonwealth Pub. Co., Inc., 118 B.R. 155, 163 (D.Mass 1990). The plaintiff must adduce evidence of both the value of the predecessor’s assets when transferred and the value the predecessor received. See In re Grassa, 363 B.R. 650, 659 (D.Mass. 2007). It is insufficient to state only the purchase price paid for the assets. See id.
If Lanee prevails on its successor liability claim, it will be entitled to recover on its judgment against Handmade directly against Dyno and Southern; in that event setting aside the transfer of assets from Handmade would accomplish nothing. If Lanee cannot establish successor liability, that would indicate that Dyno and Southern did not continue Handmade’s operations as an ongoing business, but merely purchased the assets of a failed entity on the brink of liquidation. On that basis, Lanee could show a fraudulent transfer only by presenting evidence to support a finding that the price paid was not fair value in a liquidation context. Lanee has offered no such evidence. Merely attacking the defendants’ appraisal is insufficient evidence to survive summary judgment. The Court therefore concludes that no genuine factual dispute exists on the claims of fraudulent transfer, and will grant the defendants’ motions for summary judgment as to counts II and III.
3. Tortious Interference (Counts VI and VII).
To prevail on its claim of tortious interference against Robertson and TG Capital, Lanee must prove that it had a contractual or other advantageous business relationship with Handmade; that Robertson and TG Capital knew of the relationship; that they interfered with it; that they did so for an improper motive or by improper means; and that Lanee was harmed as a result of their conduct.[12] United Truck Leasing Corp. v. Geitman, 406 Mass. 811, 812-16 (1990); Draghetti v. Chmielewski, 416 Mass. 808, 816 (1994); see also Doliner v. Brown, 21 Mass.App.Ct. 692, 695 (1986).
It is undisputed that Lanee and Handmade had a contract, under which Handmade had an outstanding obligation as of the time it began to negotiate with Robertson and TG Capital in the summer of 2007. Robertson and TG Capital deny having had specific knowledge of that relationship, but they acknowledge having had a list of Handmade’s creditors. Such a list, including Lanee, is appended to the supply agreement, which reflects terms outlined by Robertson in his letter indicating the defendants’ interest in the transaction. Ajuiy could infer that Robertson and TG Capital knew of Handmade’s debt to Lanee, along with its other debts.
No evidence indicates that these defendants took any specific action to interfere with Handmade’s performance of its obligation to Lanee, or that they ever had any specific intention to do so. Ajuiy could find, however, that these defendants designed and facilitated the transaction, under which Dyno and Southern acquired Handmade’s assets; a juiy could find interference on that basis.
As to improper motive or means, as indicated supra, the evidence is devoid of anything to indicate that Robertson and TG Capital had any particular state of mind with respect to Lanee, or even any consciousness of its existence. Nevertheless, based on the same facts discussed supra with respect to successor liability, a jury could find that these defendants engaged in conduct that they intended to, and that did, have the effect of continuing Handmade’s business, under new ownership, while shedding its debts. Ajuiy could find that to be improper. See generally Geitman, 406 Mass. at 817 (discussing factors bearing on improper motive or means). See also Draghetti v. Chmielewski, 416 Mass. at 816; Cavicchi v. Koski, 67 Mass.App.Ct. 654, 658 (2006).
Evidence is lacking, however, as to the last element, harm to Lanee. As of the summer of 2007 when the defendants engaged in the conduct giving rise to the claim, Handmade’s debt to Lanee was long overdue, and it had no capacity to pay. Other creditors had liens on its inventoiy and accounts receivable. No evidence indicates that Handmade had any other assets of significant value, and the record indicates that it had substantial other debts. No basis appears from which ajuiy could conclude that Handmade would have paid Lanee but for the defendants’ conduct, or that the defendants’ conduct made Handmade any less able (or willing) to pay Lanee than it would otherwise have been. Without evidence of harm, the claim fails. Robertson and TG Capital are therefore entitled to judgment as a matter of law on counts VI and VII.
*508 4. Unjust Enrichment (Count VIII).
Unjust enrichment is the “retention of money or property of another against the fundamental principles of justice or equity and good conscience.” Santagate v. Tower, 64 Mass.App.Ct. 324, 239 (2005), quoting Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F.Sup. 340, 347 (D.Mass. 1982). “An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law.” Santagate, 64 Mass.App.Ct. at 329. “Restitution is an equitable remedy by which a person who has been unjustly enriched at the expense of another is required to repay the injured party . . . [It] is appropriate ‘only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [one of them] to retain it.’ ” Id. at 329-30, quoting Keller v. O’Brien, 425 Mass. 774, 778-79 (1997), quoting Nat’l Shawmut Bank v. Fidelity Mut. Life. Ins. Co., 318 Mass. 142, 146 (1945).
The Court addressed Lanee’s claim of unjust enrichment against Dyno in its May 30, 2008, decision on Dyno’s motion to dismiss. The Court dismissed that claim, without leave to amend, because the facts alleged did not indicate that Dyno had received any money or property from or belonging to Lanee. Lanee’s claim of unjust enrichment against Southern suffers from the same defect; nothing in the evidence indicates that Southern ever received any money or property from or belonging to Lanee, or that Southern has been unjustly enriched at Lanee’s expense, or under circumstances giving rise to a duty of restitution on the part of Dyno toward Lanee. As already discussed, the evidence could support a finding of successor liability against Southern for Handmade’s debt to Lanee. The claim of unjust enrichment adds nothing, and the Court will order it dismissed.
CONCLUSION AND ORDER
For the foregoing reasons, Dyno Decorative Bows, LLC’s, Johnathan Robertson’s and TG Capital Corporation’s Motion for Summary Judgment is ALLOWED as to Counts II, VI, VII and IX, and DENIED as to Count IV. Southern Group Custom Manufacturing, LLC’s Summary Judgment Motion is ALLOWED as to counts III and VIII, and DENIED as to count V. The Case stands for trial on counts IV and V, claiming successor liability against Dyno and Southern. Trial is scheduled for February 14, 2011. The Court expects the session to be available for trial as scheduled, and counsel should be prepared to proceed on that date. The Clerk is directed to schedule a final trial conference at the earliest opportunity prior to that date, at which the Court will consider any motions in limine, logistical concerns, or other pre-trial matters, along with any modification or updating that may be needed to the joint final pretrial conference memorandum filed on November 17, 2009.

For clarity, the court will use the Keans’ first names.

Nhe record does not clearly indicate whether Bows de Mexico was a corporation or some other form of entity, but does establish as undisputed that Handmade owned it.

There is evidence that TG Capital has provided financing for Dyno, LLC, and has an indirect ownership interest in it.

In an affidavit submitted in support of the present motions, Saperstein confirms that opinion, indicating that “the most significant portion of the assets—the finished bows and ribbons—have a very limited market and, as such, the most that could have been expected in a liquidation sale of such assets on or about July 11, 2007, would have been 20% of book value. Based on today’s market, the same assets would likely obtain no more than 5% to 8% of book value in a liquidation sale." Saperstein also attests in his affidavit that no one requested that he provide a low appraisal, and that no one associated with Dyno, TG, or Southern ever contacted him. No other expert opinion regarding the value of the inventory appears in the record.

The record includes no expert opinion as to the value of any assets other than the inventory.

The record does not indicate whether those two held management roles at Handmade.

The Second Amended Complaint triggered a second round of motions to dismiss from Dyno, Robertson, and TG Capital. The Court (Neel, J.), denied those motions in a memorandum of decision and order dated February 17, 2009, but noted that count IX, alleging unjust enrichment against Dyno, had previously been dismissed without leave to amend, and therefore was not revived by the filing of the second amended complaint.

Handmade has not answered the complaint, and no motion by Handmade is before the Court. The Court therefore will not address these counts further, except to note that the relief sought in them against Handmade would appear to accomplish nothing, in light of Handmade’s insolvency. A declaration against Handmade would of course have no effect as to any other person or entity.

Southem did not move to dismiss, so the Court did not address this claim as to Southern when it dismissed the corresponding claim against Dyno.

 Nhe Court notes that the record is devoid of any evidence of fair value of Handmade’s business as a going concern; the evidence offered on the subject indicates that Handmade’s efforts to arrange such a sale had been unsuccessful. Still, if a jury finds that the business effectively continued, it could infer that its value as a whole was more than the sum of its parts.

Lanee’s complaint describes its claim as interference with an advantageous business relationship, rather than with a contract. The two tort theories are substantively the same. See United Truck Leasing Corp. v. Geltman, 406 Mass. at 812-16 (1990); Draghetti v. Chmielewski, 416 Mass. at 816.